**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

ROBERT CARLISLE, individually and as a
representative of a class of similarly situated persons,
on behalf of the NEW YORK STATE TEAMSTERS          8:21-cv-00455 (BKS/DJS)
CONFERENCE PENSION AND RETIREMENT
FUND,

                              Plaintiff,

v.

THE BOARD OF TRUSTEES OF THE AMERICAN
FEDERATION OF THE NEW YORK STATE
TEAMSTERS CONFERENCE PENSION AND
RETIREMENT FUND; JOHN BULGARO; BRIAN
K. HAMMOND; PAUL A. MARKWITZ; GEORGE
F. HARRIGAN; MARK D. MAY; MICHAEL S.
SCALZO, SR.; ROBERT SCHAEFFER; MARK
GLADFELTER; SAMUEL D. PILGER; DANIEL W.
SCHMIDT; TOM J. VENTURA; MEKETA
INVESTMENT GROUP, INC.; and HORIZON
ACTUARIAL SERVICES, LLC,

                              Defendants.

---

**Appearances:**

*For Plaintiff:*
Steven A. Schwartz
Chimicles Schwartz Kriner & Donaldson-Smith LLP
361 West Lancaster Avenue
Haverford, Pennsylvania 19041

Robert J. Kriner, Jr.
Chimicles Schwartz Kriner & Donaldson-Smith LLP
2711 Centerville Road, Suite 201
Wilmington, Delaware 19808

Leslie A. Blau
Blau & Malmfeldt
566 West Adams Street, Suite 600
Chicago, Illinois 60661

*For Defendants: The Board of Trustees of the American Federation of the New York State Teamsters Conference Pension and Retirement Fund; John Bulgaro; Brian K. Hammond; Paul A. Markwitz; George F. Harrigan; Mark D. May; Michael S. Scalzo, Sr.; Robert Schaeffer; Mark Gladfelter; Samuel D. Pilger; Daniel W. Schmidt; and Tom J. Ventura:*

Sara E. DeStefano
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, New York 10178

Daniel P. Bordoni
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue N.W.
Washington DC 20004

Sean McMahan
Morgan, Lewis & Bockius LLP
1717 Main Street, Suite 3200
Dallas, Texas 75201

*For Defendant Meketa Investment Group, Inc.:*
Alexander L. Bevans
Samuel N. Rudman
Choate, Hall & Stewart
Two International Place
Boston, Massachusetts 02110

Eric G. Serron
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, D.C. 20036

*For Defendant Horizon Actuarial Services, LLC:*
Edward J. Meehan
Stephen M. Saxon
Samuel I. Levin
Kalena R. Kettering
Groom Law Group, Chartered
1701 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiff Robert Carlisle brings this proposed class action, individually and as a representative of a class of similarly situated persons, on behalf of the New York State Teamsters Conference Pension and Retirement Fund (the "Plan" or the "Fund") under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., alleging (1) breach of fiduciary duty in violation of ERISA §§ 404(a)(1)(A)–(D), 29 U.S.C. §§ 1104(a)(1)(A)–(D); and (2) breach of the fiduciary duty of prudence in violation of ERISA §§ 405(a)(1) and (2), 29 U.S.C. §§ 1105(a)(1) and (2). (*See generally* Dkt. No. 1).[1] Plaintiff names as Defendants the Board of Trustees of the New York State Teamsters Conference Pension and Retirement Fund, four current Union Trustees, four current Employer Trustees, and three former Trustees (collectively "the Trustees"). (Dkt. No. 1, ¶ 20). Plaintiff also names as Defendants Meketa Investment Group, Inc. ("Meketa"), which provided investment consulting services and investment management services to the Plan, and Horizon Actuarial Services, LLC ("Horizon"), the Plan's actuary. (Dkt. No. 1, ¶¶ 21–22). Presently before the Court are the Defendants' motions under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss the Complaint. (Dkt. Nos. 102, 124, 125). Plaintiff opposes Defendants' motions. (Dkt. Nos. 140, 141, 142). The Court heard oral argument on July 28, 2023. For the reasons that follow, having considered the extensive briefing and argument in this matter, including the replies, sur-replies, and letter motions, (Dkt. Nos. 145, 147, 148, 149, 154, 155, 160, 161), as well as the supplemental motion

---

[1] Plaintiff seeks to represent the following class: "All participants and beneficiaries of the New York State Teamsters Conference Pension and Retirement Fund through the date of judgment." (Dkt. No. 1, ¶ 118).

papers, (Dkt. Nos. 179, 180, 181, 186, 187, 204, 205), Defendants' motions to dismiss under

Rule 12(b)(1) are denied and Defendants' motions to dismiss under Rule 12(b)(6) are granted.

## II.    BACKGROUND[2]

### A.    The Parties

Plaintiff is a current participant in the Plan, which "is a defined benefit, non-contributory,

multi-employer joint-trust pension plan subject to ERISA."[3] (Dkt. No. 1, ¶¶ 19, 24). "The

purpose of the Plan is to provide pension benefits to members of unions that have agreements to

make contributions to the Fund." (*Id.* ¶ 24). The Plan is funded by employer contributions and

investment returns and, as of May 2017, had 180 participating union employers. (*Id.* ¶ 25). As of

December 31, 2018, the Plan held $1.467 billion in total assets and had 33,606 participants.[4] (*Id.*

¶ 24–25). Plaintiff seeks to certify, and to be appointed as representative of, the following class:

> All participants and beneficiaries of the New York State Teamsters
> Conference Pension and Retirement Fund through the date of
> judgment.

(*Id.* ¶ 118). The Complaint defines the "class period" as 2014 to the present. (*Id.* ¶ 10).

The Plan's assets are held in a trust under the Agreement and Declaration of Trust, as

amended, and the Plan is maintained in accordance with numerous collective bargaining

agreements between unions and employers. (*Id.* ¶¶ 23–24). The Defendant Board of Trustees is

---

[2] Unless otherwise noted, these facts are drawn from the Complaint, (Dkt. No. 1), and documents the Court may consider, *see supra* Section IV.B. The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

[3] As the Second Circuit has explained, "[m]ultiemployer plans like the Fund[] are often referred to as 'Taft-Hartley' plans because they are established and maintained 'pursuant to Section 302(c) of the Taft-Hartley Act of 1947 (otherwise known as the Labor Management Relations Act [or LMRA]),'" 29 U.S.C. § 186(c). *Massaro v. Palladino*, 19 F.4th 197, 201 (2d Cir. 2021) (quoting *32BJ N. Pension Fund v. Nutrition Mgmt. Servs. Co.*, 935 F.3d 93, 96 n.3 (2d Cir. 2019)).

[4] This number includes active participants, retired or separated participants receiving benefits, other retired or separated participants entitled to benefits, and beneficiaries of deceased participants who are receiving or are entitled to receive benefits. (Dkt. No. 1, ¶ 24).

responsible for maintaining the Plan, and serves as the Plan Sponsor.[5] (*Id.* ¶ 19). The Board of Trustees is comprised of an equal number of union and employer Trustees, all of whom are Defendants in this case.[6] (*Id.* ¶ 20).

Meketa is a global investment consulting and advisory firm. (*Id.* ¶ 21). During the class period, Meketa served as the Plan's "nondiscretionary investment consultant" and as the Plan's "discretionary manager for the Plan's private market alternative investments, including PE and certain other alternatives."[7] (*Id.* ¶¶ 12, 28).

Horizon, an actuarial consulting firm, is the Plan's "enrolled actuary." (*Id.* ¶ 22). "Horizon has a professional duty to provide actuarial services consistent with relevant generally accepted standards for professional responsibility and ethics." (*Id.* ¶ 50 (citing § 901.20 Standards of performance of actuarial services, 20 C.F.R. Ch. VIII (4-1-12 Edition), (b) *Professional duty*)).

### B.    Deterioration of the Plan's Financial Condition

During 2008, the Plan lost more than $822 million, reducing the value of its assets from $2.244 billion to $1.488 billion. (Dkt. No. 102-5, at 2; *see* Dkt. No. 140-28 (2016 Plan Application to Department of Treasury for Approval of Suspension of Benefits ("As was the case for most other pension funds, the unprecedented global financial crises of 2008 had a devastating effect on the Plan.")). In April 2008, the Plan notified participants that "its funding status was in

---

[5] ERISA defines "the term 'plan sponsor'. . . in the case of a plan established or maintained by two or more employers or jointly by one or more employers and one or more employee organizations, [as] the association, committee, joint board of trustees, or other similar group of representatives of the parties who establish or maintain the plan." 29 U.S.C. § 1002(16)(B)(iii).

[6] The four Union Trustees are John A. Bulgaro (Co-Chairman), Brian K. Hammond, George F. Harrigan, and Mark D. May. (*Id.* ¶ 20). The current Employer Trustees are Michael S. Scalzo, Sr. (Co-Chairman), Mark A. Gladfelter, Samuel D. Pilger, and Daniel W. Schmidt. (*Id.* ¶ 20). All are named as Defendants in this case. Plaintiff has also named as Defendants three former trustees, Paul A. Markwitz, Robert Schaeffer, and Tom J. Ventura. (*Id.* ¶ 20).

[7] The Complaint does not identify the "certain other alternatives" that Meketa purportedly managed. (*Id.* ¶ 28).

the 'Endangered Status' (yellow zone)" "under the Pension Protection Act of 2006, [('PPA')]

Pub. L. 109-280, 120 Stat. 780" "for the Plan Year beginning January 1, 2008"—meaning that

the Plan was less than 80% funded. (Dkt. No. 1, ¶ 33). The PPA required "Endangered" plans "to

develop a Funding Improvement Plan ('FIP'), aimed at avoiding accumulating additional

funding deficiencies and increasing a plan's funded percentage in accordance with certain

benchmarks at the close of the [ten-year] Funding Improvement Period." (*Id.* ¶ 34 (citing 26

U.S.C. § 432)).

The Plan was expected to be 76% funded in 2008. (*Id.* ¶ 35). An FIP was developed with

the aim of increasing the Plan's funded percentage to 84% within 10 years. (*Id.*). Horizon

"employed an 8.5% investment return assumption to project the 84% funded point in 10 years."

(*Id.*). "Internal Plan Documents show that the 8.5% assumption was an 'actuarial return target' to

chase with high risk assets, not an independently determined actuarial return assumption by the

Plan's actuary in accordance with applicable professional standards." (*Id.*).

The Plan's funding level, however, continued to decline and by 2010, the Plan "was only

62.9% funded," and, as it was less than 65% funded, it entered "'Critical Status' (red zone) under

the PPA," which meant that the Plan would be required to operate "under a Rehabilitation Plan

('RP') to improve funding and preserve plan assets and benefits." (*Id.* ¶ 36). Having determined,

"based on the advice and recommendation of the Plan's actuaries and their use of reasonable

actuarial assumptions," "that it would not be reasonably possible for the Plan to emerge from

critical status under the PPA by the end of its [ten-year] rehabilitation period," (*id.* ¶ 37; Dkt. No.

140-27, at 2), the Trustees were "permitted to adopt a rehabilitation plan that include[d]

reasonable measures designed to allow the pension fund to emerge from critical status at a later

time or forestall possible insolvency," (Dkt. No. 1, ¶ 37).

By the time the rehabilitation plan went into effect on January 1, 2013, the Plan's funding level had decreased from 62.9% to 45.6% and "[i]nvestment returns for the Plan year 2013 were just over 5%." (*Id.* ¶ 38). In a Summer 2013 newsletter to Plan participants, the Board of Trustees acknowledged that the "most important question from participants and beneficiaries is whether there will be sufficient money to pay pension benefits that have been earned and promised" and stated that: "The simple answer is: Yes!" (*Id.* ¶ 39). The Board of Trustees made a similar statement in the Fall 2014 newsletter to participants. (*Id.* ¶ 40). In both newsletters, the Board of Trustees assured participants that: "Based on the best information and advice from the Plan's actuarial and investment professionals, the Trustees have taken the necessary steps to ensure that there will be sufficient assets to pay pensions." (*Id.* ¶¶ 39–40). "In Plan year 2015, the Plan was 45.6 percent funded." (*Id.* ¶ 42).

In January 2016, the Plan's actuary "certified the Plan[, then 45.8% funded,] as being in 'Critical and Declining' status" under the recently enacted Multiemployer Pension Reform Act of 2014 ("MPRA"), which replaced the PPA, signifying that the Plan was "projected to become insolvent." (*Id.* ¶ 43). The MPRA "established new options for trustees" and allowed, under certain circumstances, a multiemployer plan facing insolvency, i.e. the inability to pay benefits when due, to apply to the Department of Treasury for permission to reduce pension benefits. (*Id.* ¶¶ 41–44).

"On August 31, 2016, the Plan filed an application under MPRA for reduction of pension benefits." (*Id.* ¶ 44). The Plan subsequently withdrew the application and submitted a revised application addressing the Department of Treasury's preference that "the [Plan] use a different mortality table" and request for a "better" explanation from Plan actuaries regarding "the use of lower investment assumptions." (*Id.* ¶ 44). On September 13, 2017, the Department of Treasury

approved the application and benefit reductions were "implemented as of October 1, 2017." (*Id.* ¶ 45). The reductions included "a 29% reduction for retired participants, and a 19% reduction for active participants, in addition to the reductions implemented under the [Rehabilitation Plan]." (*Id.* ¶ 46). On average, a retired participant's benefits were cut from $5,000 to between $2,000 and $3,500. (*Id.* ¶ 46). Plaintiff's "vested monthly pension benefit payments were cut and have continued to be cut by 19% each month since 2017." (Dkt. No. 140, at 32 (memorandum of law)). "As of late 2017, the Plan was projected to be insolvent by 2026." (*Id.* ¶ 43).

### C.    Investments

#### 1.    Plan Investment Policy Statement

"The Plan's Investment Policy Statement ('IPS') provides '[t]he investment strategy of the [Plan] is designed to ensure the prudent investment of funds in such a manner as to provide real growth of assets over time while protecting the value of the assets from undue volatility or risk of loss.'" (Dkt. No. 1, ¶ 48). According to the IPS, the Plan's "'Risk Objectives' are: 'To accept a level of market risk consistent with moderate interim volatility without sacrificing the potential for long-term real growth of assets'; 'To use extensive diversification to minimize exposure to company and industry-specific risks in the aggregate investment portfolio'; and 'To avoid extreme levels of volatility that could adversely affect the Plan's participants.'" (*Id.*). This "'Risk Objective' is 'Within the constraints outlined above, to achieve the highest real return possible.'" (*Id.*).

#### 2.    Actuarial Return Target and Investment Strategy

From in or about 2007 to the present, in an endeavor to improve the Plan's "dangerous and worsening financial condition," the Trustees, Meketa, and Horizon utilized an "8.5% 'actuarial return target.'" (Dkt. No. 1, ¶¶ 11, 31; *see id.* ¶ 11 (alleging that in 2007, Horizon increased the actuarial assumption from 8.0% to 8.5%)). The Complaint alleges that Defendants

pursued this target by following "an extraordinary, high-risk, high-cost investment and funding strategy." (*Id.* ¶ 31). The Complaint alleges that Horizon increased the actuarial target from 8% to 8.5% in 2007, (*id.* ¶ 11), and seems to allege that Defendants began "chas[ing] high risk assets" in 2008, (*id.* ¶ 35).

In March 2014, Meketa advised the Trustees that "[i]n order to continue to assume the Fund's 8.5% target return, the Fund must be significantly invested in asset classes that are expected to outperform 8.5% over long-term periods." (*Id.* ¶ 55). However, "the 8.5% 'actuarial return target' exceeded Meketa's 20-year capital market assumptions for all but the riskiest asset classes." (*Id.* ¶ 56). Meketa also advised the Trustees that because "[t]he expected returns for many asset classes [were] not conducive to achieving [the] goal [of] [a long term target return between 7.5% and 8.5%]," "investing a larger portion of a plan's assets in" "higher returning" but "riskier asset classes may be the only way to achieve a plan's targeted return." (*Id.*) (internal quotation marks omitted). Meketa further advised that there were risks and downsides to this strategy, including a "high degree of volatility," the likelihood that the "asset classes with high expected returns" would "underperform their 'safer' counterparts in the short term," "[h]igher management fees (1.5% to 2.5% per year on committed capital, plus performance fees),"[8] danger of illiquidity, and "[l]ack of transparency." (*Id.* ¶¶ 56–57).

Although the Trustees had been advised that emerging markets equity ("EME") and private equity ("PE") investments were risky, volatile, carried greater fees, and posed a danger of illiquidity, Defendants "maintained" an allocation of approximately 14% of Plan assets to EME and 18.5% to PE—together, approximately 30% of Plan assets. (*Id.* ¶¶ 31, 67). By contrast,

---

[8] The Complaint does not indicate discuss fees for lower-risk or other asset classes, thus the Court has no point of reference.

according to a chart Meketa provided to the Trustees in 2014, peer Taft-Hartley plans allocated 2% to EME and 4% to PE. (*Id.* ¶ 67). The percentage of Plan assets invested in "high risk alternative investments" increases to 50% when the Plan's investments in infrastructure and natural resources are included:

| **Asset Class** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020 Q2 (6/30)** |
|---|---|---|---|---|---|---|---|
| Emerging Markets Equity | 15.4% | 15.6% | 14.7% | 15.6% | 13.5% | 15.0% | 15.0% |
| Private Equity | 17% | 19.6% | 19.9% | 18.3% | 20.6% | 20.0% | 21.2% |
| Infrastructure | 6.1% | 8.1% | 7.9% | 6.4% | 6.7% | 4.6% | 4.7% |
| Natural Resources | 7.8% | 7.3% | 8.9% | 9.5% | 10.1% | 8.8% | 8.4% |
| **Total** | **46.3%** | **50.6%** | **51.4%** | **49.8%** | **50.9%** | **48.4%** | **49.3%** |

(*Id.* ¶¶ 60–61).

### 3.    Emerging Markets Equity

Although "[t]he average Taft-Hartley plan had 4.5% of assets in EME,"[9] "during the Class Period, Defendants maintained 13.5% to 15.6% of the Plan's assets in EME." (*Id.* ¶ 63). During the class period, the Plan's total EME investments ranged from $147.5 million to $221.5 million, and the management fees on these investments ranged from $933,400 to $2.137 million per year. (*Id.* ¶ 78).

From 2014 to 2016, Meketa advised the Trustees, with respect to EME performance, that "emerging market economic growth has been slower than expected and more varied"; "[t]he recent increase in real interest rates and reduction in global liquidity, along with declining demand from China, will likely create headwinds for emerging market growth"; that "[u]ncertainties around global demand (particularly from emerging markets) . . . will likely cause

---

[9] The Complaint does not provide a timeframe for this representation.

heightened volatility"; "[r]elative to the peer universe, the Fund is significantly underweight domestic and international developed market equities, and is significantly overweight to emerging markets and private equity"; "Pension Funds that performed strongly in 2013 had large allocations to domestic and developed international equities, . . . . They also had smaller allocations to emerging markets debt and emerging markets equity." (*Id.* ¶¶ 65–67) Further, Meketa recommended that "long term investors allocate to emerging market equities according to the following guidelines: Minimum allocation: 10% of total equities allocation to emerging markets. Base case: most long term investors allocate 20-25% of total equities allocation. Needing high returns: consider 30% or more of total equities allocation to emerging markets." (*Id.* ¶ 71).

In February 2016, Meketa, which also served as the investment consultant to the American Federation of Musicians & Employers Pension Fund ("AFM-EPF"), another Taft-Hartley plan, "advised the AFM-EPF that discretionary portfolios" it managed for other clients were completely out of EME due to global uncertainty and China conditions unless constrained to maintain such an allocation" and that there was a "significant downside risk and limited upside potential of EMEs in the then-current environment." (*Id.* ¶ 75). Meketa "recommended the AFM-EPF substantially [] de-risk from EME and recue its EME allocation by 40%." (*Id.* ¶ 75). Meketa had previously "advised the AFM-EPF that the reason it underperformed its Taft-Hartley peers was due to its overweight allocations to EME and PE and underweight allocations to domestic equities." (*Id.*).

From 2013 to 2015, the Plan's EME investments included investments in EME funds managed by Aberdeen, Dimensional, and Vontobel. (*Id.* ¶ 78). In 2016, "Vontobel was removed from the Plan," but despite Meketa's reports from 2014 to 2016 that there had been "slower than

expected" economic growth in emerging markets, that "estimates for emerging markets excluding China" had fallen, and that "[g]rowth in emerging markets economies could be uneven going forward," from 2016 to 2018, the Trustees added two EME funds, the SSgA/MSCI index (investing $35 million in 2016), and GQG Partners (investing $36 million in 2017 and adding $28 million in 2018). (*Id.* ¶¶ 76–77). The Complaint includes a table showing the "total Plan EME investment performance as reported by MEketa for the Class Period compared to the S&P, DJIA, and VBIAX returns."

Figure 2: Plan EME Investment Performance vs. S&P, DJIA, and VBIAX Returns. (*Id.*).

|  | PY 2014 | PY 2015 | PY 2016 | PY 2017 | PY 2018 | PY 2019 | PY 2020 |
|---|---|---|---|---|---|---|---|
| **Plan EME** | 2.0% | -10.9% | 10.6% | 34.2% | -15.4% | 19.3% | -7.6% (as of end Q2) |
| **S&P 500** | 11.39% | -0.73% | 9.54% | 19.42% | -6.24% | 28.88% | -4.4% (as of end Q2) |
| **DJIA** | 7.52% | -2.23% | 13.42% | 25.08% | -5.63% | 22.34% | -9.9% (as of end Q2) |
| **Vanguard Blncd. Idx Fd. Adm. (VBIAX)** | 10% | 0.51% | 8.77% | 13.89% | -2.86% | 21.79% | -0.8% (as of end Q2) |

(*Id.* ¶ 81). "[T]he Plan lost approximately $31 million in value on the EME assets" during the class period. (*Id.* ¶ 79). The Complaint does not provide the investment performance of the Plan as a whole during the class period.

### 4.    Private Equity and Private Market Alternatives

"The Plan's alternative private market investments include PE, Natural Resources and Infrastructure." (Dkt. No. 1, ¶ 84). Meketa was the investment manager for the Plan's Private Markets Portfolio. (*Id.* ¶ 12). During the class period, the Trustees and Meketa allocated 17–21.2% of Plan assets to PE investments, 4.6%–8.1% to infrastructure investments, and 7.3%–10.1% to natural resources investments. (*Id.* ¶ 61). In May 2014, Meketa provided a chart to Trustees showing that the Plan's PE investments comprised 15% of its equity allocation while its

"U.S. Peer Group's" PE investments comprised 4% of their equity allocations. (*Id.* ¶ 67). There is no comparative information regarding natural resources or infrastructure. Meketa reported the Plan's gross return of investment with respect to PE, natural resources, and infrastructure as follows: [10]

|                   | 2014  | 2015  | 2016  | 2017  | 2018  | 2019  |
|-------------------|-------|-------|-------|-------|-------|-------|
| PE                | 12.9% | 12.3% | 12.2% | 12.7% | 12.9% | 12.6% |
| Natural Resources | 0.8%  | -0.1% | 1.8%  | 1.8%  | 1.1%  | 0.0%  |
| Infrastructure    | 5.5%  | 7.2%  | 7.8%  | 8.7%  | 8.8%  | 8.4%  |

(*Id.* ¶¶ 88–93). [11]

According to a 2015 report on the actuarial assumptions for the New York State Teacher's Retirement System, the "Target Asset Allocation for the New York State Teacher's

---

[10] The return percentages are drawn from tables in the Complaint purporting to contain data from Meketa's yearly reports regarding the Plan's PE, natural resources, and infrastructure portfolios for 2014 through 2019. (Dkt. No. 1, ¶¶ 88–93). There are three tables for each year—one for PE, one for natural resources, and one for infrastructure. (*Id.*). Each table lists the "number of partnerships," amount of "committed capital," "capital called," "distributions," and "reported value," identifies the "total value multiplier," and the "gross IRR" and "net IRR." (*Id.*). While the investment return percentages are relevant, the Complaint fails to explain the relevance of the other data points.

[11] "Meketa reported the following returns for the Plan's domestic equities and various indices for the Class Period":

|                              | 2014  | 2015  | 2016  | 2017  | 2018   | 2019  |
|------------------------------|-------|-------|-------|-------|--------|-------|
| Plan                         | 12.2% | 0.8%  | 13.2% | 20.6% | -4.8%  | 30.5% |
| Russell 3000                 | 12.6% | 0.5%  | 12.7% | 21.1% | -5.2%  | 31.0% |
| Benchmark Plus Invest        | 16.3% | 5.0%  | 14.6% | 22.0% | -2.8%  | 30%   |
| S&P 500                      | 13.7% | 1.4%  | 12.0% | 21.8% | -4.4%  | 31.5% |
| Loomis Sayles Small Cup Value| 5.3%  | -2.9% | 26.5% | 9.7%  | -16.0% | 24.5% |
| Russell 2000 Value           | 4.2%  | -7.5% | 31.7% | 7.8%  | -12.9% | 22.4% |
| Russell 2000                 | 4.9%  | -4.4% | 21.3% | 14.6% | -11.0% | 25.5% |
| SSGA Russell 1000            | 13.2% | 0.9%  | 12.0% | 21.7% | -4.7%  | 31.4% |
| Russell 1000                 | 13.2% | 0.9%  | 12.1% | 21.7% | -4.8%  | 31.4% |

(*Id.* ¶ 94). However, the Complaint does not indicate what percentage of Fund assets were invested in "domestic equities and various indices."

Retirement System fund as of 2015 was set to 7.0% for PE with a permitted range of 4–12%."

(*Id.* ¶ 100).

Regarding the drawbacks of PE investments, the Complaint alleges the following:

- A May 2020 Stanford study of returns for 571 pension plans confirmed that over the last ten years, the mean performance in PE (11.3%) matched returns of U.S. public equity. (*Id.* ¶ 97).

- A May 2020 study by Cliffwater "made clear that there is no difference in returns between PE and US stocks in [a] sample of the largest 66 pension plans over the past ten years." (*Id.* ¶ 98).

- A June 2020 paper from the University of Oxford's Journal of Investing reported that "large pension funds have earned roughly $1.5 (net of fees) per $1 invested in private equity funds," yielding a return "about the same as the returns in public equity." (*Id.* ¶ 96).

- Meketa's June 2020 "Disclosure Brochure" states:

    Private market investments involve a significant degree of risk and are suitable only for sophisticated clients who have no immediate need for liquidity of the amount invested and who can afford a risk of loss of all or a substantial part of such investment.

    * * *

    There is no assurance that such investments will be profitable and there is a substantial risk that associated losses and expenses will exceed income and gains.

(*Id.* ¶ 86).

The "ongoing pandemic and accompanying financial crisis" "has exposed the Plan to further risk of losses" as a result of Defendants "'significantly overweight'" allocation of "Plan assets to high risk illiquid alternatives investments." (*Id.* ¶¶ 102–07 (citing commentators and papers discussing COVID-19's impact on PE firms, including bankruptcy, negative impacts on revenues, costs, and profitability, and projections of volatility and defaults)).

### D.    Post-Complaint Restoration of Benefits[12]

On January 28, 2022, the Board of Trustees applied, on behalf of the Plan, to the Pension

Benefit Guaranty Corporation ("PBGC"), for special financial assistance pursuant to the

American Rescue Plan Act of 2021 ("ARPA"), 29 U.S.C. § 1432.[13] (Dkt. No. 163, at 1). Under

the ARPA, a multiemployer plan whose application is approved receives, with no repayment

obligation, 28 U.S.C. § 1432(a)(2), funds sufficient (1) to pay pension benefits through 2051, *id.*

§ 1432(j)(1), and (2) to restore all suspended benefits to participants, retroactively in a lump-sum

payment, *id.* § 1432(k)(1)–(2). A plan that receives special financial assistance is barred from

implementing future benefits reductions under the MPRA. 29 U.S.C. § 1432(m)(6).

On November 18, 2022, the PBGC approved the Plan's application. (Dkt. No. 176, at 1).

On December 9, 2022, the Plan received more than $900 million in special financial assistance

from the federal government, (Dkt. No. 179-1, at 10; Dkt. No. 179-2, ¶ 4), and "restored benefits

for all participants to pre-MPRA reduction levels." (Dkt. No. 179-2, ¶ 5; Dkt. No. 179-3, at 1).

Plaintiff's monthly benefit payment was "increased . . . from $821.01 per month to $907.83 per

month," "the amount that was in effect prior to the Fund's reduction of benefits in 2017." (Dkt.

No. 179-1, at 10; Dkt. No. 179-2, ¶ 6). In addition, in March 2023, the Fund provided

"participants with lump sum payments reflecting the amount of MPRA benefit reduction

between October 1, 2017, and the December 1, 2022, restoration." (Dkt. No. 179-2, ¶ 7). Plaintiff

received a check for $5,382.84 "representing the total benefit reduction he experienced from

October 1, 2017 until the December 2022 restoration." (Dkt. No. 179-1, at 10; Dkt. No. 179-2, ¶

---

[12] These facts are drawn from the parties' notices and status reports regarding the Plan's application for special financial assistance and their supplemental briefing and are relevant to the parties' arguments on standing and mootness. *See supra* note 2.

[13] The Board of Trustees subsequently withdrew its application to make "adjustments it its initial filing," (Dkt. No. 167, ¶ 2), and submitted a revised application to the PBGC on July 21, 2022, (Dkt. No. 172, at 1).

8). Neither Plaintiff nor any beneficiary was repaid with interest.[14] (Dkt. No. 181, at 9; Dkt. No. 181-1, at 3). Plaintiff claims he is entitled to $1,127.70 in interest and that "the aggregate interest damages for all Plan participants exceeds $70 million." (Dkt. No. 181, at 9; Dkt. No. 181-1, at 3).

## III.    MOTION TO DISMISS – FED. R. CIV. P. 12(b)(1)

Defendants move to dismiss the Complaint under Rule 12(b)(1) on the ground that the funding the Plan received under the ARPA and the restoration of Plaintiff's benefits have rendered Plaintiff's claims moot, and that, in any event, Plaintiff lacks standing. Plaintiff opposes Defendants' motion.

### A.    Standard of Review

"A court faced with a motion to dismiss pursuant to both Rules 12(b)(1) and 12(b)(6) must decide the jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a decision on the merits and, therefore, an exercise of jurisdiction." *Mann v. N.Y. State Ct. of Appeals*, No. 21-cv-49, 2021 WL 5040236, at *3, 2021 U.S. Dist. LEXIS 209018, at *8 (N.D.N.Y. Oct. 29, 2021) (citation omitted). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (citation omitted). The Court may also "refer to evidence outside the pleadings" and "take judicial notice of documents in the public record, including state court filings." *Krajisnik Soccer Club, Inc. v. Krajisnik Football Club, Inc.*, No. 20-cv-1140, 2021 WL 2142924, at *2, 2021 U.S. Dist. LEXIS 99456, at *5 (N.D.N.Y. May 26, 2021) (citations omitted).

---

[14] The MPRA does not provide for the payment of interest. 29 U.S.C. § 4262(k)(2).

### B.    Mootness

Defendants argue that this action is moot and Plaintiff no longer possesses a concrete stake in the outcome of this litigation because his benefits have been restored and the corpus of the Plan has been made whole. (Dkt. No. 179-1; Dkt. No. 187). Plaintiff opposes Defendants' motion, arguing, among other things, that this action is not moot because the collateral source rule applies and permits double recovery.[15] (Dkt. No. 181).

Where a party "los[es] a stake in ongoing litigation," the question is not "whether the party losing its stake in the litigation has lost its *standing* but . . . whether the action has become *moot*." *Klein ex rel. Qlik Techs., Inc. v. Qlik Techs., Inc.*, 906 F.3d 215, 220–21 (2d Cir. 2018) (emphases in original). To avoid an action becoming moot, "the plaintiff 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.'" *Bank v. Caribbean Cruise Line, Inc.*, 606 F. App'x 28, 29 (2d Cir. 2015) (summary order) (quoting *Spencer v. Kemna*, 523 U.S. 1, 7 (1998)). Although "[t]he burden of establishing standing falls on the plaintiff," the "burden of showing mootness . . . falls on a defendant." *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016) (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 191–92 (2000)).

"Federal courts regularly apply the 'collateral source rule,' which permits a plaintiff to recover damages from a tortfeasor though the plaintiff has already received compensation for its injuries from a third-party and even when such an award would lead to double recovery." *In re State St. Bank & Tr. Co. Erisa Litig.*, 579 F. Supp. 2d 512, 517 (S.D.N.Y. 2008); *see Hartnett v. Reiss S.S. Co.*, 421 F.2d 1011, 1016 (2d Cir. 1970) ("The general rule in the federal courts is that

---

[15] As the Court concludes that the collateral source rule applies, it need not reach Plaintiff's arguments regarding interest.

the collateral source rule is applied."). "According to this doctrine, which is an established exception to the general rule that damages in a negligence action must be compensatory, a wrongdoer is not permitted to reduce a plaintiff's recovery because of benefits which the latter may have received from another source." *Cunningham v. Rederiet Vindeggen A/S*, 333 F.2d 308, 316 (2d Cir. 1964); *see Ebert v. City of New York*, No. 04-cv-9971, 2006 WL 3627103, at *1, 2006 U.S. Dist. LEXIS 43337, at *3 (S.D.N.Y. June 26, 2006) ("The collateral source rule is a substantive rule of law that bars a tortfeasor from reducing the quantum of damages owed to a plaintiff by the amount of recovery the plaintiff receives from other sources of compensation that are independent of (or collateral to) the tortfeasor." (quoting *Davis v. Odeco, Inc.*, 18 F.3d 1237, 1243 (5th Cir. 1994)).

"The collateral source rule 'is based on the reality that benefits paid by a third party—a collateral source—will amount to a windfall for the plaintiff if they are not deducted, and for the defendant if they are deducted.'" *Sass v. MTA Bus Co.*, 6 F. Supp. 3d 238, 255 (E.D.N.Y. 2014) (quoting *Norris v. N.Y.C. Coll. of Tech.*, No. 07–cv–853, 2009 WL 3841970, at *1, 2009 U.S. Dist. LEXIS 107821, at *3 (E.D.N.Y. Nov. 18, 2009)). In general, the collateral source rule allows any windfall to fall in the plaintiff's favor: "the principle of justice underlying the collateral source rule, is that it is the innocent victim rather than the guilty tortfeasor who is the preferable recipient of any windfall caused by outside compensation." *Yankee Gas Servs. Co. v. UGI Utilities, Inc.*, 852 F. Supp. 2d 229, 254–55 (D. Conn. 2012); *see also Williams v. Sec'y of Navy*, 853 F. Supp. 66, 72 (E.D.N.Y. 1994) (explaining that under the collateral source rule, courts decline "to use funds obtained from a source unconnected with the culpable party to reduce that party's liability").

However, "the rationale for the collateral source rule disappears 'when the [defendant] is the source of the benefit—that is, where the source of the benefit is not collateral." *Norris*, 2009 WL 3841970, at *1, 2009 U.S. Dist. LEXIS 107821, at *4 (quoting *EEOC v. Yellow Freight Sys., Inc.*, 2001 WL 1568322, at *1, 2001 U.S. Dist. LEXIS 20240, at *4 (S.D.N.Y. Dec. 6, 2001)). Courts have, for example, deducted unemployment compensation from plaintiffs' back pay awards where the defendants themselves funded the unemployment benefits. *See, e.g.*, *Stratton v. Dep't for the Aging for City of New York*, 922 F. Supp. 857, 866 & n.8 (S.D.N.Y. 1996) (deducting unemployment benefits from the plaintiff's back pay award, noting that although the "Plaintiff's unemployment benefits were paid directly to her by the New York State Department of Labor," because the defendant made "payments for the unemployment compensation claims paid out to its former employees, rather than making contributions to the state unemployment insurance fund," the collateral source rule was inapplicable); *Williams v. Sec'y of Navy*, 853 F. Supp. 66, 72 (E.D.N.Y. 1994) (approving deduction of unemployment compensation from back pay, explaining that while "unemployment insurance, coming from a collateral source (a public agency), should not serve to reduce a culpable employer's liability," the rationale behind the collateral source rule was inapplicable because the defendant reimbursed the public agency "in an amount equal to unemployment compensation paid to its employees").

Defendants' argument that the application of the collateral source rule "would run afoul of the central purpose of ERISA," (Dkt. No. 179-1, at 20–22), has been largely rejected. Courts have applied the collateral source rule in ERISA cases, finding it to be "consistent with 'ERISA's essentially remedial purpose of protecting beneficiaries of pension plans.'" *State St. Bank*, 579 F. Supp. 2d at 518 (quoting *Salovaara v. Eckert*, 222 F.3d 19, 31 (2d Cir. 2000)); *see also Merriam v. Demoulas*, No. 11-cv-10577, 2013 WL 2422789, at *3, 2013 U.S. Dist. LEXIS

77600, at *7 (D. Mass. June 3, 2013) (rejecting the defendants' argument that the plaintiff

participants in ERISA profit-sharing plan lacked standing to pursue breach of fiduciary duty

claims because a restorative payment had cured the $46 million loss that formed the basis of the

plaintiffs' injury, explaining that a "plaintiff does not lose standing to sue a tortfeasor just

because a third party has already compensated her for the injury"). Indeed, the Second Circuit

has relied on the principles of the collateral source rule in finding an ERISA fiduciary liable for

losses caused by her breach even though others previously restored the plan's losses. *Chao v.*

*Merino*, 452 F.3d 174, 176 (2d Cir. 2006).

In *Merino*, the Secretary of Labor sued the defendant for breaching her fiduciary duties

by allowing the ERISA fund "to deal with a known embezzler" who caused the fund more than

$350,000 in losses. 452 F.3d at 176. The district court rejected the defendant's argument that she

was entitled to a "setoff, against the loss she caused" of amounts third parties (employers and a

national union organization) gave to the fund to restore the losses. *Id.* The Second Circuit

affirmed, finding "no rational basis for a setoff," explaining that "[t]he underlying purposes of

ERISA would not be furthered by awarding an errant fiduciary credit for [double] contributions

made by an employer or others concerned about continuing health care coverage for employees."

*Id.* It further explained that "[a]lthough the ultimate goal of ERISA § 409(a) is 'the restoration of

the trust beneficiaries to the position they would have occupied but for the breach of trust,' the

express language of that section makes the breaching fiduciary liable not directly for losses to

beneficiaries, but for 'losses *to the plan*.'" *Id.* at 185 (citations omitted) (emphasis in original)

(first quoting *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985); and then quoting 29

U.S.C. § 1109(a)). Although the Second Circuit did not expressly cite the collateral source rule

in deciding *Merino*, the principles on which it relied in finding the defendant remained liable for

the losses attributable to her fiduciary breach, despite the restoration of those losses by third parties, have provided meaningful guidance to courts applying "the collateral source rule in the ERISA context." *Merriam*, 2013 WL 2422789, at *3, 2013 U.S. Dist. LEXIS 77600, at *8 (citing *Merino*, 452 F.3d at 184–85); *see also Beta Grp., Inc. v. Steiker, Greenaple, & Croscut, P.C.*, No. 15-cv-213, 2018 WL 461097, at *3, 2018 U.S. Dist. LEXIS 9069, at *7–8 (D.R.I. Jan. 18, 2018) (finding the "collateral source rule readily applies in the ERISA context" and noting that "courts have recognized that payments made by a fiduciary or plan sponsor to correct errors connected to the operation of an ERISA-governed plan do not rescind or set off fiduciaries' capacity to recover from actual wrongdoers" (citing *Merino*, 452 F.3d at 184–85)).

Applying these principles to the present case, the Court concludes that the collateral source rule applies to the federal government's payment of more than $900 million to the Plan and that this payment does not impair Plaintiff's capacity to recover from the alleged wrongdoers or moot this action. Defendants present no argument or evidence that the source of the funds are from anyone other than a third party. This case is unlike *Williams*, 853 F. Supp. at 72, for example, where the defendant itself reimbursed the public unemployment insurance agency for unemployment benefits paid to the plaintiff. In this case, the Plan received more than $900 million from the federal government but is not required to reimburse any of it. Therefore, because the source of the payment that led to the restoration of Plaintiff's benefits was wholly independent of Defendants, it was a collateral source. *See Barkanic v. Gen. Admin. of Civ. Aviation of the People's Republic of China*, 923 F.2d 957, 964 n. 8 (2d Cir. 1991) ("The collateral source rule prohibits courts from considering benefits received from third parties in determining the extent of the plaintiff's recovery.").

Citing *Gervis v. Berg*, No. 00-cv-3362, 2006 WL 8445730, 2006 U.S. Dist. LEXIS 108705 (E.D.N.Y. Sept. 13, 2006), Defendants assert that the federal government's $900 million payment to the Plan is akin to an "insurance payment made by or on behalf of the defendant" and argue that therefore that payment is not a collateral source and that it should be "offset against anything the defendants might otherwise owe the plaintiff." (Dkt. No. 179-1, at 17). In *Gervis*, the court found "certain of [the] Plaintiffs' claims moot" because "their injuries were cured when" they were reimbursed for their investment losses by the Securities Investor Protection Corporation ("SIPC"), an "independent nonprofit, membership corporation created by the federal Securities Investor Protection Act." *Id.* 2006 WL 8445730, at *3, *5, 2006 U.S. Dist. LEXIS 108705, at *9, *13. Because the SIPC was paid for by member securities broker-dealers, including one of the tortfeasors in *Gervis*, the court concluded that the source of the funds was not a collateral source. *Id.* 2006 WL 8445730, at *5, 2006 U.S. Dist. LEXIS 108705, at *15 (explaining that although "[p]ayments from an insurance policy are considered collateral source payments when the plaintiff maintains the insurance policy completely independent of the defendants," because one of the wrongdoers responsible for the plaintiffs' injuries was a "member broker" of the SIPC, which was "akin to an insurance program funded by payments made by its member brokers" the collateral source rule was inapplicable (citing Restatement (Second) of Torts § 920A)). Here, by contrast, there is no evidence that any Defendant contributed to the funds the federal government provided to the Plan.

To the extent Defendants argue that because the Plan itself restored Plaintiff's benefits, the collateral source rule is inapplicable, their argument is without merit. (Dkt. No. 179-1, at 19). The focal inquiry is the source of the funds, not who supplied them to the plaintiff. *See Ebert*, 2006 WL 3627103, at *3, 2006 U.S. Dist. LEXIS 43337, at *9–10 (observing that "the source of

the funds may be determined to be collateral or independent, even though the . . . tortfeasor

supplies such funds" and explaining that "[a]pplication of the collateral source rule depends less

upon the source of funds than upon the character of the benefits received") (quotation marks

omitted); *Fullam v. Cnty. of Nassau*, No. 07-cv-07, 2008 WL 11417737, at *3, 2008 U.S. Dist.

LEXIS 52191, at *7–8 (E.D.N.Y. July 7, 2008) (concluding that "the collateral source rule

prohibits consideration of the disability payments received by the Plaintiff," explaining that

"there is no evidence that the disability pension was provided by the [defendant] in order to

offset tort liability" and that "the disability pension can be collateral despite the fact that it has

been provided by the . . . tortfeasor"). Indeed, it appears that the payment made to the Plan was

funded by taxpayers and that Defendants in no way contributed to those funds. *Cf. Gervis*, 2006

WL 8445730, at *5, 2006 U.S. Dist. LEXIS 108705, at *15 (concluding that because "the SIPC

payments [were] not wholly independent of the tortfeasors," they were not a collateral source).

The Court therefore finds the funds the federal government provided to the Plan is a collateral

source and does not moot Plaintiff's claim in this case.[16]

---

[16] The Court finds Defendants' arguments concerning the "one satisfaction rule" and "direct benefit" rule unhelpful at this juncture. The "one satisfaction rule" provides that "when a plaintiff receives a settlement from one defendant, a nonsettling defendant is entitled to a credit of the settlement amount against any judgment obtained by the plaintiff against the nonsettling defendant as long as both the settlement and judgment represent common damages." *Singer v. Olympia Brewing Co.*, 878 F.2d 596, 600 (2d Cir. 1989). Defendants provide no authority for applying the "one satisfaction rule," which largely governs a determination of whether a set-off is warranted, at the motion to dismiss stage, and to a party who is neither a joint tortfeasor nor, like the SIPC in *Gervis*, funded by a joint tortfeasor or defendant. *Gervis*, 2006 WL 8445730, at *5–6, 2006 U.S. Dist. LEXIS 108705, at *16. As to the "direct benefits" rule, Defendants largely rely on treatises which refer to payments made by a tortfeasor or individual acting for a joint tortfeasor. (*See, e.g.*, Dkt. No. 179-1, at 23 n.14 (citing Restatement (Second) of Torts § 920A(1) (1979) ("A payment made by a tortfeasor or by a person acting for him to a person whom he has injured is credited against his tort liability, as are payments made by another who is, or believes he is, subject to the same tort liability.")); Dkt. No. 179-1, at 24 n.15 (citing Dan B. Dobbs & Caprice L. Roberts, Law of Remedies: Damages, Equity, Restitution 488 (3d ed. 2018))). As discussed, there is no basis for inferring that when the federal government provided $900 million to the Plan it was acting for a joint tortfeasor.

C.      Standing[17]

The Plan argues that Plaintiff lacks Article III standing because the remedy he seeks, the restoration of investment losses, will not redress the harm Plaintiff allegedly suffered—the reduction in his pension benefits. (Dkt. No. 124-1, at 16). Plaintiff responds that his alleged injury, the 19% reduction in his benefits, is redressable because if he "wins this lawsuit, any damages collected will be" used to: (1) "repay participants directly"; (2) restore "in whole or part" the previously imposed reductions to vested benefits payments"; or (3) "to limit the amount of future benefits cuts, or all three." (Dkt. No. 140, at 33).

"Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies'" and "[o]ne element of the case-or-controversy requirement is that plaintiffs must establish they have standing to sue." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citation and internal quotation marks omitted). "[T]he irreducible constitutional minimum contains three elements." *Lujan*, 504 U.S. at 560. To establish standing, (1) "the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest," (2) "there must be a causal connection between the injury and the conduct complained of," and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560–61 (citations and internal quotation marks omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Whalen v. Michael Stores Inc. ("Whalen I")*, 153 F. Supp. 3d 577, 580 (E.D.N.Y. 2015), *aff'd*, 689 F. App'x 89 (2d Cir. 2017) (quoting *Lujan*, 504 U.S. at 561). "The redressability prong does not demand that court-ordered relief completely redress all injury." *Dean v. Town of Hempstead*, 527 F. Supp. 3d

---

[17] Because "[t]he existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n.4, (1992) (quoting *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 830 (1989)), the Court must also consider whether Plaintiff had standing at the time he brought this suit.

347, 406 (E.D.N.Y. 2021); *see Larson v. Valente*, 456 U.S. 228, 244 n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury.").

The Complaint provides two facts regarding Plaintiff: (1) he is a "current participant in the Plan as defined by 29 U.S.C. § 1002(7)";[18] and (2) he has been a participant in the Plan since prior to 2014. (Dkt. No. 1, ¶ 18). Although the Complaint alleges that on or about October 1, 2017, the "Plan implemented massive benefit reductions, including a 29% reduction for retired participants, and a 19% reduction for active participants," (*id.* ¶ 46), it does not indicate whether Plaintiff falls into either category of participant. However, in a memorandum of law, Plaintiff represents that he is an "active Fund participant[]" and that his vested pension benefits have been cut by 19%. (Dkt. No. 140, at 32). These allegations are sufficient to show that Plaintiff was injured "in a personal and individual way," such that he "has a personal stake in the controversy." *Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003) (explaining that courts must "assess whether the injury 'affect[s] the plaintiff in a personal and individual way,' to confirm that the plaintiff has a personal stake in the controversy") (internal citation omitted) (quoting *Lujan*, 504 U.S. at 560 n.1); *cf.*, *Thole v. United States Bank N.A.*, 590 U.S. 538, 547 (2020) (finding the plaintiffs, who alleged breach of fiduciary duty with respect to their defined-benefit plan, lacked Article III standing as they had "received all of their vested pension benefits so far, and they are legally entitled to receive the same monthly pension benefits for the rest of their lives, and therefore had "no concrete stake in this dispute"). At issue here is the third element—

---

[18] ERISA defines the term "participant" as "any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit." 29 U.S.C. § 1002(7).

whether the reduction in Plaintiff's benefits "will be redressed by a favorable decision" in this matter. *Lujan*, 504 U.S. at 561.

Here, Defendants assert that because the MPRA does not permit benefit restoration until the Plan's actuary certifies that the plan "is projected to avoid insolvency indefinitely," (Dkt. No. 124-1, at 17–18 (citing 29 U.S.C. § 1085(e)(9)(E)(i)(II))),[19] even if Plaintiff were to recover assets on behalf of the Plan, given that the Plan's liabilities currently exceed assets by more than $1 billion, "the recovery would barely move the needle" and "[i]t would be pure speculation to suggest the Plan could restore some or all of the benefit reductions and still avoid insolvency if Plaintiff were to prevail in this lawsuit." (*Id.* at 18). Defendants further assert that, in any event, because the MPRA places the decision to provide benefit improvements within the discretion of the Board of Trustees, "whether [a] recovery would result in an increase in pension benefits would be entirely speculative." (*Id.* (citing 29 U.S.C. § 1085(e)(9)(E)(i) ("The Plan Sponsor may, in its sole discretion, provide benefit improvements while any suspension of benefits under the plan remains in effect."))).

A redressability inquiry "focuses . . . on whether the injury that a plaintiff alleges is likely to be redressed through the litigation." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 286–87 (2008). "[R]edressability—has been interpreted to mean that a plaintiff's standing depends on the form of relief requested." *MacIssac v. Town of Poughkeepsie*, 770 F. Supp. 2d 587, 593 (S.D.N.Y. 2011) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)). To satisfy the redressability requirement, a plaintiff must establish that "it is likely and not merely speculative that the plaintiff's injury will be remedied by the

---

[19] Defendants further note that the MPRA permits benefit restorations if the "benefit reductions are scheduled to expire by their terms," but such "condition" is not relevant here. (Dkt. No. 124-1, at 17).

relief plaintiff seeks in bringing suit[ ]." *Sprint Commc'ns Co.*, 554 U.S. at 273–74 (internal

quotation marks omitted) (citing *Lujan*, 504 U.S. at 560–61).

ERISA "does not provide a remedy for individual injuries distinct from plan injuries."

*LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008); 29 U.S.C. § 1132(a)(2).

Accordingly, not only must Plaintiff bring his ERISA claims in a derivative capacity on behalf of

the Plan under § 1132(a)(2), but any relief Plaintiff may obtain will "inur[e] to the Plan" and will

only indirectly benefit individual participants. *L.I. Head Start Child Dev. Servs., Inc. v.*

*Economic Opportunity Comm'n of Nassau Cnty.*, 710 F.3d 57, 66 (2d Cir. 2013). Here, Plaintiff

seeks: (1) a declaration that Defendants breached their fiduciary duties under ERISA; (2) an

order directing Defendants to "restore all losses to the Plan which resulted from the breaches of

fiduciary duty"; (3) a disgorgement of profits made by Defendants; (4) a constructive trust over

any assets received by any breaching fiduciary in connection with their violations of ERISA; (5)

an order directing "the Plan to allocate its assets prudently"; (6) an order attaching "any

breaching fiduciary's" "accounts in or benefits from the Plan"; (7) the appointment of an

independent fiduciary "to administer the Plan and manage the Plan's investments and/or

selection of investments and/or to oversee the divestment of the Plan's imprudent investments

and reduction of investment management costs"; (8) "a full accounting of all fees paid . . . by the

Plan"; (9) an award of prejudgment and postjudgment interest; (10) an award of attorneys' fees

and costs; and (11) "all such other remedial or equitable relief as the Court deems appropriate."

(Dkt. No. 1, ¶ 154).[20] Taken together, Plaintiff's factual allegations of ongoing financial harm as

---

[20] These requests for relief are consistent with ERISA. *See* 29 U.S.C. § 1109(a) (providing that a breaching fiduciary "shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary."); 29 U.S.C. § 1132(a)(3) (permitting ERISA participants "(A) to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan"); *see also Watson v. Consol. Edison of N.Y.*, 594 F. Supp. 2d 399, 407 (S.D.N.Y. 2009) (citing *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996) (noting

a result of Defendants' continued investment strategy, (*see, e.g.*, Dkt. No. 1, ¶¶ 61 (chart showing "Plan's investment allocations to EMEs, PE and other alternatives" from 2014 through the second quarter of 2020 ranged from 50.6% to 55.1%), 71 (showing allocation Plan EME assets ranging from 26.4% to 27.5% of total Plan equities assets from 2014 through the second quarter of 2020)), which the Court accepts as true at this stage, suffice to show that an injunction or other equitable relief regarding the management of the Plan going forward would remedy the alleged ongoing harm. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998) ("If respondent had alleged a continuing violation or the imminence of a future violation, the injunctive relief requested would remedy that alleged harm.").

Further, even accepting Defendants' argument that Plaintiff's injuries cannot be redressed completely and that there are obstacles to benefit restoration or improvement, because Plaintiff's requested relief, if granted, would improve the Plan's financial condition, Plaintiff sufficiently alleges redressability. *See Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 337 F. Supp. 3d 308, 323 (S.D.N.Y. 2018) ("Even if we were to accept defendants' argument that plaintiff's injuries will not be completely redressed unless it actually receives TPP funds, restoring plaintiff to a position where it can better compete for such funds must at least constitute partial redress, which is all that is required for purposes of Article III standing." (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 151–53 (2010) (holding that farmers had standing to challenge restrictions on an agency's ability to deregulate a genetically engineered product even though their ultimate goal of deregulation could not be achieved without further agency action)); *see also Massachusetts v. E.P.A.*, 549 U.S. 497, 526 (2007) (finding

---

that ERISA section 502(a)(3) serves "as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy")).

redressability where relief sought would reduce further risk of injury "to some extent"); *Lujan*, 504 U.S. at 569 n.4 ("The redressability element of the Article III standing requirement and the 'complete relief' referred to by Rule 19 are not identical."); *Shalom Pentecostal Church v. Acting Sec'y U.S. Dep't of Homeland Sec.*, 783 F.3d 156, 161–62 (3d Cir. 2015) (holding that redressability is based on the "availability of relief at a given step, rather than the likelihood of achieving the ultimate goal")). Thus, the Court concludes Plaintiff has adequately shown redressability. Accordingly, Defendants' motion to dismiss for lack of standing under Rule 12(b)(1) is denied.

## IV.    MOTION TO DISMISS – FED. R. CIV. P. 12(b)(6)

### A.    Standard of Review

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Second Circuit has "cautioned that 'the nature of ... allegations under ERISA calls for particular care in applying this ... inquiry in order to ensure that the ... [c]omplaint alleges *nonconclusory* factual content raising a plausible inference of misconduct and does not rely on the vantage point of hindsight.'" *Sacerdote v. New York Univ.* ("*Sacerdote II*"), 9 F.4th 95, 107

(2d Cir. 2021) (emphases in original) (quoting *Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.* ("*PBGC*"), 712 F.3d 705, 718 (2d Cir. 2013). However, because "ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences," *id.* (quoting *PBGC*, 712 F.3d at 718), an ERISA claim "may withstand a motion to dismiss based on sufficient circumstantial factual allegations to support the claim, even if it lacks direct allegations of misconduct," *id.*

### B.    Materials Outside the Complaint

The parties have submitted approximately fifty exhibits in connection with the pending motions. (*See* Dkt. Nos. 102-3 to 102-5, 124-3 to 124-12, 125-3 to 125-12, 140-1 to 140-31, 144). There are no exhibits attached to the Complaint.

As an initial matter, because the Court may refer to evidence outside the pleadings in considering a Rule 12(b)(1) motion to dismiss for lack of standing and mootness, *Krajisnik Soccer Club, Inc.*, 2021 WL 2142924, at *2, 2021 U.S. Dist. LEXIS 99456, at *5, to the extent these submissions are relevant to standing and mootness, the Court has considered them. However, to the extent the parties seek the Court's consideration of these submissions in connection with the Rule 12(b)(6) motions, further analysis is required.[21]

"Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). However, considering "materials outside the complaint is not entirely foreclosed on a 12(b)(6) motion." *Id.* A complaint "is deemed to include any written instrument attached to it as an

---

[21] As the submissions the parties filed as part of the parties' notices and status reports regarding the Plan's application for special financial assistance and their supplemental briefing, (Dkt. Nos. 163, 176, 179-1, 179-2, 179-3, 181, 181-1), are relevant only to standing and mootness, and the parties do not offer them in any other context, the Court has not construed them as offered in connection with the Rule 12(b)(6) motions.

exhibit or any statements or documents incorporated in it by reference." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *Id.* (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (internal quotation marks omitted)). Even where a document is integral to the complaint, it must be "clear" that "no dispute exists regarding the authenticity or accuracy of the document" and that "there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner*, 463 F.3d at 134. "[I]f material is not integral to or otherwise incorporated in the complaint, it may not be considered unless the motion to dismiss is converted to a motion for summary judgment and all parties are 'given a reasonable opportunity to present all the material that is pertinent to the motion.'" *Id.* (quoting Fed. R. Civ. P. 12(d)).

The Complaint relies on the terms and effects of: the 2015 Horizon Survey of Capital Market Assumptions, (Dkt. No. 102-3; Dkt. No. 1, ¶ 51); the Fall 2014 New York State Teamsters Benefit Fund's Newsletter, (Dkt. No. 102-5; Dkt. No. 1, ¶ 40); the Plan's Rehabilitation Plan (as amended and restated), (Dkt. No. 140-27; Dkt. No. 1, ¶ 37); the 2018 Form 5500, Annual Return/Report of Employee Benefit Plan, (Dkt. No. 125-9; Dkt. No. 1, ¶ 25); and the Plan's May 15, 2017, revised MPRA Application ("2017 MPRA Application"), (Dkt. No. 124-4; Dkt. No. 1, ¶ 45). With the exception of the 2017 MPRA Application, there is no dispute as to the accuracy or authenticity of these documents. The Court may therefore consider these exhibits. The authenticity of the 2017 MPRA Application does not appear to be at issue but Horizon disputes Plaintiff's interpretation of, inter alia, the "Assumed Annual Investment Return" contained therein. (Dkt. No. 145, at 5; *see also* Dkt. No. 124-4, at 47–48 (Horizon's

"certification" of the Plan's "critical and declining status" stating that the "Assumed Annual Investment Return" was "6.75 per year through 12/21/2025 and 7.50% thereafter")). Accordingly, the Court does not consider the 2017 MPRA Application.

In addition, because the Complaint quotes from and includes links to the Summer 2013 New York State Teamsters Benefit Fund's Newsletter, (Dkt. No. 1, ¶ 39), and the June 2020 Meketa Disclosure Brochure, (*id.* ¶ 86), the Court considers these documents. *See Lowell v. Lyft, Inc.*, 352 F. Supp. 3d 248, 263 n.5 (S.D.N.Y. 2018) ("Courts may take judicial notice of publically [sic] available websites when the authenticity is not in dispute."). Plaintiffs also submit as exhibits pleadings, documents, transcripts, and orders from other court proceedings. (Dkt. Nos. 140-8, 140-10 to 140-16, 140-29 to 140-31). While the Court may take judicial notice of publicly filed documents, the Court does so only to the extent they "establish the fact of such litigation and related filings." *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006). The Court does not consider these exhibits "for the truth of the matters asserted in the other litigation." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

Plaintiff has filed two declarations by Plaintiff's counsel, both of which contain facts not alleged in the Complaint. (Dkt. Nos. 140-1, 144). Horizon vigorously opposes any consideration of these "hearsay declarations" and requests that the Court either decline to consider them or grant limited discovery on the alleged facts in Plaintiff's counsel's declarations. (Dkt. No. 146, 147 (letter motions)). Plaintiff opposes discovery. (Dkt. No. 148). As the declarations contain facts outside the Complaint, the Court excludes them from consideration. *See Kopec v. Coughlin*, 922 F.2d 152, 155 (2d Cir. 1991) (finding the district court erred in considering affidavit containing facts outside the complaint on motion to dismiss).

Plaintiff has also filed excerpts from the Fund's Application to the Department of the

Treasury for Approval of Suspension of Benefits under the MPRA, (Dkt. No. 140-28), and the

March 18–19, 2020, Meketa Fund Evaluation Report, in his opposition to the Fund Defendants'

motion to dismiss, (Dkt. No. 140-20). Although the Complaint refers to both documents, (Dkt.

No. 1, ¶¶ 44 (referring to the Application for Suspension of Benefits), 87 (referring to the Meketa

Report)), the Court declines to consider them at this juncture. With respect to the Application for

Suspension of Benefits, the Complaint alleges that the Plan filed an Application and later

withdrew it after the Treasury requested additional information. (Dkt. No. 1, ¶ 44). This minor

reference is insufficient to support a conclusion that Plaintiff relied heavily on the terms and

effects of the Application in drafting the Complaint. Moreover, as noted, Plaintiff only provided

an excerpt from the Application. (*See* Dkt. No. 140-28 (containing pages 15 to 18 of

Application)). The Court therefore declines to consider it. The Court also declines to consider the

Meketa Fund Evaluation Report. (Dkt. No. 140-20). Again, Plaintiff only provided an excerpt of

the Report. More problematic, however, is the fact that the excerpt Plaintiff provided contains a

table showing "Allocation vs. Targets and Policy," listing the current balances and allocations

for the Plan's investments, while the Complaint cites the Report in connection with "disclaimers"

Meketa purportedly made to the Trustees. (*Id.* at 3). The "disclaimers" are not reflected in the

excerpt provided. Accordingly, the Court has no basis for considering this document.

Horizon filed a copy of the June 2020 Actuarial Standards of Practice, No. 27. (Dkt. No.

102-4). The Complaint references the Actuarial Standards of Practice, No. 27, Section 3.6(e),

(Dkt. No. 1, ¶ 51), but does not indicate what year Plaintiff is referring to. Moreover, the June

2020 version indicates that a number of changes and amendments were made, (Dkt. No. 102-4,

at 6 ("Summary of Notable Changes")). As there is a question as to whether the parties are

relying on the same version of ASOP No. 27, the Court declines to consider the copy Horizon filed, (Dkt. No. 102-4), and relies instead on the allegations in the Complaint.

The Complaint does not incorporate any of the remaining exhibits by reference or rely heavily on their terms and effects. Despite their filing of numerous exhibits on a Rule 12(b)(6) motion, the Plan Defendants, Meketa, and Plaintiff provided little briefing regarding the ground on which the Court could properly consider these exhibits. They assert that because the Complaint contains "facts [that] are based on documents given by the Plan to Plaintiff in response to Plaintiff's statutory requests for Fund documents," and "[b]ecause ERISA permits a participant to request plan records prior to filing a lawsuit, courts routinely take notice of materials that a plan provides to a plaintiff through that process." (Dkt. No. 124-1, at 8, n.1 (citing Dkt. No. 1, ¶ 18); Dkt. No. 125-1, at 9 n.1; Dkt. No. 140, at 9 n.1). The only case the parties cite, however, is *Patterson v. Stanley*, No. 16-cv-6568, 2019 WL 4934834, at \*4, 2019 U.S. Dist. LEXIS 174832, at \*10 (S.D.N.Y. Oct. 7, 2019), which broadly refers to documents that were referenced in the complaint, that the plaintiff relied on in bringing suit, or that were entitled to judicial notice, but contains no discussion of an ERISA pre-filing process that renders all documents provided subject to judicial notice. As the parties identify no other basis on which consideration of these documents would be proper on a motion to dismiss, and the Court declines to convert the motion to one for summary judgment, the Court excludes all remaining documents. Fed. R. Civ. P. 12(d).

### C.    ERISA Breach of Fiduciary Duty Claims

Defendants seek dismissal of Plaintiff's breach of fiduciary duty claims on the grounds that: (1) Plaintiff, as a person affected by a benefit suspension, is not a proper plaintiff and does not have a cause of action for breach of fiduciary duty under ERISA; (2) Plaintiff fails to allege that Horizon, the Plan's actuary, is a fiduciary; (3) ERISA's statute of repose bars Plaintiff's duty

of loyalty claim; and (4) Plaintiff fails to state claims of breach of fiduciary duty in connection

with the duties of loyalty, prudence, and diversification, and with respect to Plan documents or

co-fiduciary liability. Plaintiff opposes Defendants' motions.

### 1.    The MPRA Did Not Eliminate Plaintiff's Breach of Fiduciary Duty Claim

Defendants argue that, by its terms, 29 U.S.C. § 1085(e)(9)(I)(iii) ("clause (iii)") of the

MPRA, which is entitled "Restricted cause of action" and provides that "[a] participant or

beneficiary affected by a benefit suspension . . . shall not have a cause of action under this

subchapter" precludes Plaintiff, as a participant affected by a benefit suspension under MRPA,

from bringing *any* breach of fiduciary claim under ERISA. (Dkt. No. 124-1, at 20–21). Plaintiff

opposes Defendants' motion, arguing that while this provision may preclude him from bringing a

breach of fiduciary claim in connection with the suspension of benefits, it does not otherwise

limit his right to bring a breach of fiduciary claim under ERISA. (Dkt. No. 140, at 38–41). The

Court agrees with Plaintiff.

It is undisputed that Plaintiff is a participant within the meaning of ERISA and that, as

such, he is entitled to bring a civil action alleging breach of fiduciary duty under Title I of

ERISA.[22] 29 U.S.C. §§ 1132(a)(2), (3); 29 U.S.C. §§ 1104(a)(1)(A)–(D), 1105(a)(1) and (2).

Thus, Defendants' argument that clause (iii) completely eradicates this right of action for all

participants and beneficiaries affected by a benefit suspension is dubious. Further, clause (iii)

falls under subparagraph "(I) Judicial Review," which articulates the circumstances under which

---

[22] The statutory provisions authorizing Plaintiff's claims are set forth in Title I, also known as Subchapter I, of ERISA, 29 U.S.C. §§ 1001–1191. *See Pension Ben. Guar. Corp. v. Scherling*, 905 F.2d 173, 175 n.6 (8th Cir. 1990) ("Although ERISA as passed was divided into four 'titles,' upon codification into Title 29 of the United States Code, the 'titles' were re-named 'subchapters' in order to fit with the scheme of the Code."); *see also Pension Benefit Guar. Corp. v. Bank One, N.A.*, 34 F. Supp. 2d 608, 610 n.1 (S.D. Ohio 1998) (explaining that "in the codified version, ERISA is currently divided into three subchapters with Title IV of ERISA codified as subchapter III; Title I of ERISA is codified in subchapter I").

a plan sponsor can challenge the "denial of an application for suspension of benefits," 29 U.S.C. § 1085(e)(9)(I)(i) ("clause (i)"), and specifies the "Timing of action" for "challenging a suspension of benefits" as well as applicable "Standards of Review," 29 U.S.C. § 1085(e)(9)(I)(ii) ("clause (ii)"). While clause (i) of this "Judicial Review" subparagraph states that a "plan sponsor" can challenge the denial of an application for suspension of benefits, clause (ii) does not identify who can bring an action "challenging a suspension of benefits." 29 U.S.C. § 1085(e)(9)(I)(i), (ii). Clause (iii), however, states that "[a] participant or beneficiary affected by a benefit suspension under this paragraph *shall not* have a cause of action under this subchapter." 29 U.S.C. § 1085(e)(9)(I)(iii) (emphasis added). Read in its entirety, therefore, clause (iii) seems to restrict participants and beneficiaries from bringing a breach of fiduciary claim—a cause of action they are otherwise entitled to bring under Title I of ERISA, 29 U.S.C. § 1132(a)(2)— challenging the denial or approval of an application for suspension of benefits. Defendants have not adequately addressed how this isolated clause in a broad statutory scheme could be read as anything but limited to causes of actions challenging the denial or approval of an application for suspension of benefits. Indeed, in considering the "overall context" of ERISA, *see Moya v. United States Dep't of Homeland Sec.*, 975 F.3d 120, 131 n.7 (2d Cir. 2020) ("It is appropriate to draw on the 'overall context' of a statute only when doing so is helpful to understand the meaning of the specific provisions at issue."), the Court notes that the interests ERISA protects are readily identifiable as ERISA itself explains that its "principal goal is to 'protect . . . the interests of participants in employee benefit plans and their beneficiaries,'" *Gerosa v. Savasta & Co.*, 329 F.3d 317, 328 (2d Cir. 2003) (quoting 29 U.S.C. § 1001(b)). Thus, in any event, it is unlikely that Congress intended to eliminate all of a participant or beneficiary's rights under ERISA through a single clause in a judicial review provision governing actions concerning the

suspension of benefits. *See Whitman v. Am. Trucking Assoc'ns*, 531 U.S. 457, 468 (2001)

("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague

terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

Accordingly, as Plaintiff does not seek to challenge the suspension of benefits in this case, the

Court concludes that § 1085(e)(9)(I)(iii) does not otherwise prohibit Plaintiff from bringing his

Title I ERISA claims.

### 2.      Horizon is Not an ERISA Fiduciary

Horizon moves to dismiss on the ground that the Complaint fails to allege it is a fiduciary

with respect to the Plan and that provision of actuarial services is not an ERISA fiduciary

function. (Dkt. No. 102-1, at 11–17). Plaintiff opposes dismissal, arguing that Horizon acted as a

fiduciary by exercising authority and control over management of plan assets, 29 U.S.C. §

1002(21)(A)(i), and by rendering investment advice for a fee, 29 U.S.C. § 1002(21)(A)(ii). (Dkt.

No. 142, at 14–25). Horizon's motion is granted.

"To state a claim for breach of fiduciary duty under ERISA, Plaintiffs must adequately

allege that (1) Defendants were fiduciaries of the plan who, (2) while acting within their

capacities as plan fiduciaries, (3) engaged in conduct constituting a breach of an ERISA

fiduciary duty." *Gearren v. McGraw-Hill Cos., Inc.*, 690 F. Supp. 2d 254, 261 (S.D.N.Y. 2010)

(citing 29 U.S.C. § 1109), *aff'd*, 660 F.3d 605 (2d Cir. 2011). Thus, "[i]n every case charging

breach of ERISA fiduciary duty, . . . the threshold question is not whether the actions of some

person employed to provide services under a plan adversely affected a plan beneficiary's interest,

but whether that person was acting *as a fiduciary* (that is, was performing a fiduciary function)

when taking the action subject to complaint." *Massaro v. Palladino*, 19 F.4th 197, 211 (2d Cir.

2021) (emphasis in original) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000)).

Under ERISA, a fiduciary is one who (i) "exercises any discretionary authority or discretionary control respecting management of [a] plan or exercises any authority or control respecting management or disposition of its assets"; (ii) "renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so"; or (iii) "has any discretionary authority or discretionary responsibility in the administration of [a] plan." *Forgione v. Gaglio*, No. 13-cv-9061, 2015 WL 718270, at *6, 2015 U.S. Dist. LEXIS 21644, at *17–18 (S.D.N.Y. Feb. 13, 2015) (quoting 29 U.S.C. § 1002(21)(A)). "In contrast to 'traditional trust law,' 'ERISA . . . defines 'fiduciary' . . . in *functional* terms of control and authority over the plan[.]'" *Id.* 2015 WL 718270, at *6, 2015 U.S. Dist. LEXIS 21644, at *18 (emphasis in original) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993)).

### a.     Authority and Control Over Management of Plan Assets

Plaintiff alleges that Horizon exercised authority and control over the management of Plan assets by "setting an ASOP 27-compliant 6.75% to 7.5% for true actuarial purposes" but "setting and maintaining the unreasonably optimistic assumed 8.5% return as the target for the management of decisions for investment purposes." (Dkt. No. 142, at 16). Plaintiff argues that Horizon "had a central role in the asset management by setting and maintaining the assumed 8.5% return based on the extraordinary asset allocation policy to serve as the target for the investment decisions." (*Id.* at 17). Even drawing all inferences in Plaintiff's favor, because Plaintiff's allegations solely concern Horizon's provision of actuarial services to the Plan, (*see* Dkt. No. 1, ¶ 11 (alleging that "Horizon, as the Plan's enrolled actuary, in 2007, recklessly increased the actuarial return assumption from 8% to 8.5%" and "continued to use this . . . 8.5% actuarial return assumption), they fail to plausible allege that Horizon had any discretion, authority, or control over the management of the Plan, *see Forgione*, 2015 WL 718270, at *9,

2015 U.S. Dist. LEXIS 21644, at *26–27 (finding the plaintiffs failed to plausibly allege the defendant actuary was a fiduciary where allegations of discretion and authority were conclusory and "the only work that [the defendant actuary] is alleged to have done is actuarial, *viz.*, the preparation of annual valuation reports").

While Plaintiff alleges that the Trustees relied on Horizon's actuarial "information and advice" in taking "the necessary steps to ensure that there will be assets to pay pensions," (Dkt. No. 1, ¶ 38), without facts suggesting anything more than that Horizon's actuarial calculations influenced and supported the Plan's allegedly aggressive investment strategy, there is no basis to infer that Horizon exercised any control over the Trustee's or Meketa's investment decisions.

In *Allen v. Credit Suisse Securities (USA) LLC*, 895 F.3d 214, 217 (2d Cir. 2018), the plaintiffs sued a number of banks for breach of ERISA fiduciary duty, alleging that the defendant banks had "fraudulently manipulated benchmark rates to maximize the profit they reaped from" foreign exchange ("FX") transactions and that they were "performing a fiduciary function when they executed FX transactions for the plans." *Id.* at 223, 225. The Second Circuit concluded that the "facts alleged do not show that defendants exercised the control over Plan assets necessary to establish ERISA functional fiduciary status," *id.* at 218, where "the transactions at issue were initiated not by the banks but at the discretion of the Plans' independent investment managers," and there were "[n]o allegations" indicating that the defendant banks "were able to exercise any control over the Plans' trustees' or investment managers' decisions to enter into FX transactions with defendants," *id.* at 225. The Second Circuit explained that the "relationship" between the banks and the plan was akin to "'salesmanship,' with defendants 'matching the customer's desires'—as conveyed by their investment managers—'with available inventory,' but otherwise lacking 'authority to exercise control unilaterally over a portion of a plan's assets.'" *Id.* at 224

(quoting *Farm King Supply, Inc. Integrated Profit Sharing & Tr. v. Edward D. Jones & Co.*, 884 F.2d 288, 292 (7th Cir. 1989)).

In this case, while the actuarial relationship between Horizon and the Plan, the Trustees, and Meketa was not one of "salesmanship," *Allen* illustrates that influence, without allegations of control over the decision-making or plan assets, is insufficient to show control over the management of plan assets. *See e.g., Apogee Enters., Inc. v. State St. Bank & Trust Co.*, No. 09-cv-1899, 2010 WL 3632697, at *2, 2010 U.S. Dist. LEXIS 977716, at *5 (S.D.N.Y. Sept. 17, 2010) (concluding that the plaintiffs failed to allege facts showing CitiStreet was a fiduciary under ERISA where complaint alleged only that it prepared "investment reports" for the "Plan's Investment Committee" containing "rates of return for [plan investments] . . . asset listings [with] descriptions of all securities held in the portfolio . . . [and] strategy statements or prospectuses that describe the investment strategies currently in place").

Plaintiff further argues that "[a]s an enrolled actuary of a Taft-Hartley plan, Horizon was required to determine a reasonable actuarial return assumption in accordance with accepted professional actuarial standards" and "independent from the investment desires or aspirations of the Trustees" or Meketa. (Dkt. No. 142, at 11). According to Plaintiff, Horizon violated actuarial standards and "knew or should have known the 8.5% was grossly excessive and unreasonable under accepted actuarial standards" and "failed to account for the extraordinary excessive cost and risk in the Plan's portfolio." (Dkt. No. 1, ¶¶ 11, 35, 55, 111, 142). These allegations of actuarial violations and wrongdoing, however, are insufficient to show authority and control over Plan assets. *See Allen*, 895 F.3d at 225–26 (rejecting the plaintiff's argument that fraud in the defendant banks' "conduct of FX transactions" supported their fiduciary claims, explaining that the "alleged wrongdoing did not afford defendants the control over the Plans' assets necessary to

40

make them ERISA functional fiduciaries"). Indeed, the Second Circuit, "as well as sister

circuits," have held that "wrongdoing in performing non-fiduciary services does not transform

the alleged wrongdoer into a fiduciary." *Allen*, 895 F.3d at 225 (citing inter alia *Reich v.*

*Lancaster*, 55 F.3d 1034, 1049 (5th Cir. 1995) (stating that, in absence of "actual decision

making power," "even miscreant professionals . . . who provide necessary services to ERISA

plans" are not automatically fiduciaries)).

### b.    Investment Advice for a Fee

In order to plead that a defendant is a fiduciary because it provided "investment advice

for a fee," "a plaintiff must plead facts sufficient to demonstrate that '(1) the defendant provided

individualized investment advice; (2) on a regular basis; (3) pursuant to a mutual agreement,

arrangement, or understanding that (4) the advice would serve as a primary basis for the plan's

investment decisions; and (5) the advice was rendered for a fee.'" *Walker v. Merrill Lynch & Co.*

*Inc.*, 181 F. Supp. 3d 223, 233–34 (S.D.N.Y. 2016) (quoting *F.W. Webb Co. v. State St. Bank &*

*Trust Co.*, 2010 WL 3219284, at *8, 2010 U.S. Dist. LEXIS 82759, at *25 (S.D.N.Y. Aug. 12,

2010).

The Complaint alleges that Horizon provided the Trustees and Meketa an "8.5% actuarial

investment return assumption" and an "8.5% 'actuarial return target'" causing the Plan to "chase

this . . . return assumption with extraordinary allocations of Plan assets to the riskiest asset

classes." (Dkt. No. 1, ¶¶ 10–11). Plaintiff cites no caselaw that would support a conclusion that

determining the actuarial return assumption for the investments the Plan made or intended to

make, and providing that actuarial determination to the Plan, constitutes rendering investment

advice for a fee under ERISA. Nor does Plaintiff allege facts showing that Horizon provided

anything other than actuarial services and determinations; there are no facts that would allow a

plausible inference that Horizon provided "individualized investment advice" "pursuant to

mutual agreement, arrangement, or understanding" that Horizon's "advice would serve as a

primary basis for the plan's investment decisions." *Walker*, 181 F. Supp. 3d at 233–34; *see*

*Gerosa v. Savasta*, 189 F. Supp. 2d 137, 141 (S.D.N.Y. 2002) (granting motion to dismiss by the

fund's actuary, where the plaintiffs failed to alleges that fund's actuary "was engaged to perform,

or did perform, anything other than actuarial services"), *rev'd on other grounds by Gerosa v.*

*Savasta & Co.*, 329 F.3d 317 (2d Cir. 2003).

Because the Complaint fails to allege Horizon is a fiduciary under ERISA, Plaintiff's

claim of co-fiduciary liability under 29 U.S.C. § 1105(a)[23] also fails. Accordingly, Horizon's

motion to dismiss the Complaint is granted.

### 3.   The Duty of Loyalty Claim Against Meketa May Not Be Dismissed as Barred by the Statute of Repose

Meketa asserts that Plaintiff's duty of loyalty claim must be dismissed as barred by

ERISA's six-year statute of repose because the Trustees hired Meketa as discretionary

investment manager in 2011, approximately nine years before Plaintiff filed the Complaint. (Dkt.

No. 125-1, at 26 (citing 29 U.S.C. § 1113(1)(A)). As relevant here, ERISA's limitations period

requires suits for breach of fiduciary duty to be brought within six years of "the date of the last

action which constituted a part of the breach or violation." 29 U.S.C. § 1113(1); *see Browe v.*

*CTC Corp.*, 15 F.4th 175, 190 (2d Cir. 2021) (explaining that "§ 1113(1)'s "six-year limitations

period is a statute of repose that begins running either on the date of the last action constituting a

breach" (citing *Intel Corp. Inv. Policy Comm. v. Sulyma*, 589 U.S. 178, 180 (2020))). Relying on

the "continuing duty" principle discussed in *Tibble v. Edison International*, 575 U.S. 523, 529–

---

[23] ERISA provides that fiduciary is liable for the breach of another fiduciary if he or she (1) participates knowingly in, or knowingly undertakes to conceal, and act or omission of such other fiduciary, knowing such act or omission is a breach; or (2) enables another fiduciary to commit a breach; or (3) has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts to remedy the breach. 29 U.S.C. § 1105(a).

30 (2015), Plaintiff argues that while "Meketa's initial unseemly pitch" occurred more than six years ago, because "Meketa had a direct continuing conflict in its dual role," as investment consultant and discretionary investment manager, "simultaneously every day thereafter," his claim is timely. (Dkt. No. 141, at 25).

In *Tibble*, the defendants allegedly breached the "duty of prudence by offering higher priced retail-class mutual funds when the same investments were available as lower priced institutional-class mutual funds." 575 U.S. at 527. The initial selection of funds, however, occurred more than six years prior to the filing of the complaint. *Id.* The Supreme Court held that the claim was not barred, explaining that because the duty of prudence imposed a "continuing duty . . . to monitor trust investments and remove imprudent ones," "so long as the alleged breach of the continuing duty occurred within six years of suit, the claim is timely." *Id.* at 530.

Meketa argues that *Tibble* is inapplicable because it concerned the duty of prudence and that Plaintiff has failed to cite caselaw supporting the proposition that the duty of loyalty required Meketa "continually to revisit the propriety of its [discretionary investment manager] pitch." (Dkt. No. 154, at 12). There are no facts in the Complaint indicating when the alleged "pitch" occurred, when the Trustees hired Meketa as discretionary investment manager or under what terms, or whether Meketa served as discretionary investment manager throughout entirety of the relevant time period. Meketa relies on a chart in the Complaint reflecting its annual compensation and "Service Code Type" for each year beginning in 2009 and ending in 2018 in support of its assertion that the "pitch" and "dual role" began in 2011. (Dkt. No. 1, ¶ 110). While the chart indicates that Meketa's compensation increased from $258,410 in 2010 to $1,399,116 in 2011, the chart does not reflect the addition of "[i]nvestment management fees" to the "Service Code Type" of compensation Meketa received until 2014. (*Id.*). Thus, the Court cannot

say it is clear from the face of the Complaint that the "date of the last action which constituted a

part of the breach or violation" occurred more than six years prior to filing. 29 U.S.C. §

1113(1)(A); *see Abraha v. Colonial Parking, Inc.*, 243 F. Supp. 3d 179, 189–90 (D.D.C. 2017)

(denying motion to dismiss on the ground that it was not clear from "the face of the Complaint"

that the plaintiffs' breach of fiduciary duty claims were time-barred). However, to the extent

Plaintiff seeks to assert a duty of loyalty claim arising from Meketa's conduct prior to October

21, 2014, such claim is barred by the statute of repose. In any event, for the reasons discussed

below the Court concludes that the Complaint fails to state a claim that Meketa or the Trustees

breached their duty of loyalty.

### 4.    The Complaint Fails to Plausibly Allege a Duty of Loyalty Claim against the Trustees or Meketa

Defendants assert the duty of loyalty claim must be dismissed because the Complaint

fails to allege that the Trustees or Meketa acted with the purpose of providing benefits to

themselves or someone else. (Dkt. No. 125-1, at 25–29; Dkt. No. 124-1, at 30 n.22). Plaintiff

opposes dismissal of the breach of loyalty claim. (Dkt. No. 141, at 23–28; Dkt. No. 140, 31 n.

17).

Under ERISA § 404(a)(1)(A), a fiduciary must act for the "exclusive purpose of . . .

providing benefits to participants and their beneficiaries[ ] and defraying reasonable expenses of

administering the plan." 29 U.S.C. § 1104(a)(1)(A). The duty of loyalty requires that "decisions

must be made with an eye single to the interests of the participants and beneficiaries." *Donovan*

*v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982). "'To plausibly plead a duty of loyalty claim

under ERISA, a plaintiff must allege facts showing that the fiduciary in question acted

purposely—or with the 'goal'—of "providing benefits to itself or someone else.'" *Brown v.*

*Daikin Am., Inc.*, No. 18-cv-11091, 2021 WL 1758898, at *5, 2021 U.S. Dist. LEXIS 85195, at

*15 (S.D.N.Y. May 4, 2021) (quoting *Sacerdote v. New York Univ.* ("*Sacerdote I*"), No. 16-cv-6284, 2017 WL 3701482, at *5, 2017 U.S. Dist. LEXIS 137115, at *10–11 (S.D.N.Y. Aug. 25, 2017), *vacated on other grounds by Sacerdote II*, 9 F.4th 95).

Plaintiff argues that Meketa (1) made an "unseemly pitch," using its position as the Plan's nondiscretionary investment consultant to recommend itself for the position of "private assets manager," and (2) acted for the purpose of benefitting itself when it recommended that the Plan pursue an 8.5% actuarial return target and make imprudently large allocations of Plan assets to EME, PE, and private market alternatives, the very assets it managed as the Plan's private assets manager. (Dkt. No. 141, at 23–28; *see* Dkt. No. 1, ¶ 109). Plaintiff alleges that the Trustees breached their duty of loyalty by hiring and allowing Meketa to operate in a dual, conflicted role. (Dkt. No. 1, ¶ 131).

The Complaint alleges that Meketa operated under conflict of interest because it advised the Trustees concerning the "high-risk, high-cost asset allocation," as the Plan's investment consultant, while also serving as the asset manager for the Plan's "Private Markets Portfolio," which include its EME, PE, and other private market investments. (Dkt. No. 1, ¶¶ 12, 109). In this dual role, the "Plan fees paid to Meketa soared from $250,000 to $1.4 million annually" and required the Plan to pay a monitoring firm $180,000 per year to monitor Meketa in its role as investment consultant. (*Id.* ¶ 12). Plaintiff argues that Meketa's roles as investment consultant and manager of the Plan's private market alternatives, for which it was entitled to "a substantially greater fee," combined with Meketa's advocacy for allocating funds to the "private market alternatives" it managed allows an inference of imprudence.

Even assuming the timeliness of Plaintiff's claim that Meketa's "unseemly pitch," as the Plan's investment consultant, for the position of private market assets manager breached the duty

45

of loyalty, because the Complaint fails to allege facts allowing a plausible inference that the Trustees or Meketa acted for the purpose of providing benefits to Meketa, it fails to allege a breach of the duty of loyalty. "[A] plaintiff does not adequately plead a claim simply by making a conclusory assertion that a defendant failed to act 'for the exclusive purpose of' providing benefits to participants and defraying reasonable administration expenses; instead, to implicate the concept of 'loyalty,' a plaintiff must allege plausible facts supporting an inference that the defendant acted <u>for the purpose</u> of providing benefits to itself or someone else." *Sacerdote I*, 2017 WL 3701482, at *5, 2017 U.S. Dist. LEXIS 137115, at *15. Although, "allegations of affiliation do not state a claim for breach of the duty of loyalty standing alone, 'an allegation of such affiliation can be coupled with other circumstantial factual allegations to suggest plausibly that a fiduciary acted . . . disloyally.'" *Carrigan v. Xerox Corp.*, No. 21-cv-1085, 2022 WL 1137230, at *9, 2022 U.S. Dist. LEXIS 70428, at *27 (D. Conn. Apr. 18, 2022) (quoting *Bekker v. Neuberger Berman Grp. LLC*, No. 16-cv-6123, 2018 WL 4636841, at *6, 2018 U.S. Dist. LEXIS 166690, at *15 (S.D.N.Y. Sept. 27, 2018)).

The Complaint provides no factual details regarding the pitch itself. It does not, as noted, contain any facts indicating when Meketa made the pitch, i.e., before or after Defendants began pursuing the allocation strategy at issue, what Meketa offered when making the "pitch," who made the hiring decision, or what the terms were involved in Meketa's hiring in a second role. However, as circumstantial factual allegations may allow a plausible inference of a breach of duty of loyalty where an ERISA complaint lacks allegations referring to a fiduciary's knowledge, methods, or investigations, *PBGC*, 712 F.3d at 718, the Court considers whether the circumstantial allegations allow an inference of breach of loyalty.

Here, Plaintiff alleges that Meketa used its position as investment consultant to advocate for its hiring as manager of the Plan's private markets portfolio, the "Plan fees paid to Meketa soared from $250,000 to $1.4 million annually" after it hired Meketa as its private markets manager, and Meketa recommended, as the Plan's investment consultant, that the Plan make significant allocations of Plan assets to PE and other private market alternatives under Meketa's management, for which Meketa collected "management fees." (Dkt. No. 1 ¶¶ 12, 109). But none of these allegations allow a plausible inference that the Trustees or Meketa acted for the purpose of providing benefits to Meketa or someone else. Indeed, courts have rejected attempts to infer a conflict of interest from the fact that a defendant had dual roles with respect to a plan. *See Brown*, 2021 WL 1758898, at *5, 2021 U.S. Dist. LEXIS 85195, at *15 ("Plaintiffs attempt to *infer* a conflict of interest from the fact that John Hancock held dual roles with respect to the Plan. But . . . that fact alone does not demonstrate that [Defendant] . . . [acted] towards its own benefit or even John Hancock's."). Courts have also rejected, as insufficient, claims that a defendant breached the duty of loyalty by favoring financial interest of a service provider that incidentally benefit that provider, explaining that a plaintiff must allege that a "defendants' actions were *for the purpose of* providing benefits to themselves or someone else and did not simply have that incidental effect." *Cunningham v. Cornell Univ.*, No. 16-cv-6525, 2017 WL 4358769, at *1, *4, 2017 U.S. Dist. LEXIS 162420, at *4, *14 (S.D.N.Y. Sept. 29, 2017) (dismissing claim that the defendants breached the duty of loyalty by favoring the financial interests of "conflicted third-party service providers" "in receiving a steady stream of revenue from [service provider's] proprietary funds over the interests of participants by allowing [service provider] to mandate the inclusion of its own funds in the Plans" explaining that "these claims do not support an inference that defendants' actions were *for the purpose of* providing benefits to

themselves or someone else and did not simply have that incidental effect") (internal quotation marks omitted), *aff'd*, 86 F.4th 961 (2d Cir. 2023); *McCaffree Fin. Corp. v. ADP, Inc.*, No. 20-cv-5492, 2023 WL 2728787, at *16, 2023 U.S. Dist. LEXIS 56362, at *53–54 (D.N.J. Mar. 31, 2023) (finding complaint failed to plead breach of duty of loyalty claim where allegations that the defendants "purportedly" gave "Voya 'carte blanche' in designing the Plan's investment menu [permitting] Voya to extract the most fees possible without considering Voya's conflicts of interest" and that "a significant portion of the Plan [was] invested in Voya-managed investment options, which are proprietary funds" suggested conflict of interest but did not allege "include[] facts suggesting that Defendants engaged Voya Financial as recordkeeper, or included Voya's proprietary investments . . . for the purpose of—rather than merely having the effect of— benefiting Voya"). Thus, as the Complaint contains only generalized allegations that Meketa had a conflict of interest and sought a dual role for the purpose of increasing its fees, and contains no facts alleging that the Trustees hired, or Meketa promoted itself, for the purpose of benefitting Meketa, it fails to state a breach of the duty of loyalty claim. *See Brown*, 2021 WL 1758898, at *1, *5, 2021 U.S. Dist. LEXIS 85195, at *5, 15 (rejecting the plaintiffs' "attempt to *infer* a conflict of interest from the fact that John Hancock," the plan's trustee, and manager of five of the investment funds at issue, held "dual roles with respect to the Plan," and concluding that the complaint contained "no plausible facts showing that Daikin," a defined contribution plan "selected" the funds at issue "for the purpose of benefitting itself or John Hancock"); *cf.*, *Kohari v. MetLife Grp., Inc.*, No. 21-cv-6146, 2022 WL 3029328, at *9, 2022 U.S. Dist. LEXIS 136505, at *29 (S.D.N.Y. Aug. 1, 2022) (denying motion to dismiss duty of loyalty claim where the plaintiffs alleged that the defendant MetLife fiduciaries not only selected and retained proprietary investments but that "[e]ach of the MetLife Index Funds charge an annual operating

expense that is paid to MetLife and deducted from the rate of return of the fund, and MetLife also claims a tax deduction called the Dividend Received Deduction . . . on dividends received on the assets owned by MetLife on behalf of the Plan") (internal quotation marks omitted). Accordingly, the duty of loyalty claim is dismissed.

### 5. The Complaint Fails to Plausibly Allege a Duty of Prudence Claim[24]

Plaintiff alleges that Defendants breached the duty of prudence by (a) setting an "unreasonable and grossly excessive" 8.5% actuarial return target; (b) deviating from allocation strategies used by peer funds and allocating a significant portion of Plan assets to EME, PE, and private market investments despite evidence that these investments presented a high risk of volatility and illiquidity; (c) continuing to allocate significant percentages to EME, PE, and other private market investments even though peer plans with greater allocations to domestic equities were better performing; and (d) relying on Meketa, despite its conflict of interest as both investment consultant and private markets manager. (Dkt. No. 1). Defendants seek dismissal on the ground that Plaintiff's allegations are largely conclusory and that allegations of risky investments and comparisons to "peer funds," without additional factual allegations, are insufficient to state a plausible claim for relief. (Dkt. No. 124-1, at 22–30; Dkt. No. 125-1, at 12–25).

---

[24] Much of Plaintiff's argument centers on *Snitzer v. Board of Trustee of the American Federation of Musicians and Employers' Pension Fund*, No. 17-cv-5361, and the court's denial of the defendants' motion to dismiss the complaint, *see* Transcript of Oral Argument & Bench Decision, *Snitzer*, No. 17-cv-05361, (S.D.N.Y. Apr. 26, 2018), ECF No. 90. In *Snitzer*, the plaintiff asserted that the plan's "trustees breached their fiduciary duty by investing substantial percentages of the fund in emerging markets equity and private equity, the first of which is very volatile and risky, and the second of which is illiquid." *Id.*, ECF No 90, at 40. The district court found that the plaintiff's allegations that "this fund was significantly overweighted in volatile and illiquid assets classes (specifically EME and private equity) vis-a-vis its Taft-Hartley peers, nudges plaintiff's claim across the line from possible to plausible." *Id.*, ECF No. 90, at 41–42. Although the claims in *Snitzer* appear very similar to the claims Plaintiff asserts in this case, because the bench decision contains minimal factual analysis and cites no legal authority in its analysis or disposition of the breach of fiduciary claims, the Court finds it of little guidance. The Court therefore takes notice of the *Snitzer* decision but has engaged in an independent analysis, which has led it to a different conclusion regarding the plausibility of Plaintiff's breach of fiduciary duty claims.

The duty of prudence "requires that the fiduciary act 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.'" *Id.* (quoting 29 U.S.C. § 1104(a)(1)(B)). "The prudence of a fiduciary 'is measured according to the objective prudent person standard developed in the common law of trusts.'" *Sacerdote II*, 9 F.4th at 107 (quoting *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984)). The Second Circuit instructs that "[u]nder that common-law standard, and consistent with ERISA's instruction that fiduciaries act in a prudent manner 'under the circumstances then prevailing,' '[w]e judge a fiduciary's actions based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight.'" *PBGC*, 712 F.3d at 716 (first quoting 29 U.S.C. § 1104(a)(1)(B); and then quoting *In re Citigroup ERISA Litig.*, 662 F.3d 128, 140 (2d Cir. 2011)). "In other words, 'this standard focuses on a fiduciary's conduct in arriving at an investment decision, not on its results, and asks whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment.'" *Kohari*, 2022 WL 3029328, at *6, 2022 U.S. Dist. LEXIS 136505, at *20 (quoting *PBGC*, 712 F.3d at 716); *see also Ferguson v. Ruane Cunniff & Goldfarb Inc.*, No. 17-cv-6685, 2019 WL 4466714, at *5, 2019 U.S. Dist. LEXIS 160112, at *14 (S.D.N.Y. Sept. 18, 2019) ("[C]ourts analyze a fiduciary's *process* to determine prudence, not outcome.").

"A claim for breach of the duty of prudence will 'survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably infer from what is alleged that the process was flawed' 'that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident.'" *Sacerdote II*, 9 F.4th at 108 (quoting *PBGC*, 712 F.3d at 718). Thus, the omission of "factual allegations referring directly to [the

fiduciary's] knowledge, methods, or investigations at the relevant times . . . is not fatal to a claim" so long as circumstantial factual allegations allow a plausible inference of flawed process. *PBGC*, 712 F.3d at 718; *see also Kohari*, 2022 WL 3029328, at *7, 2022 U.S. Dist. LEXIS 136505, at *22 (observing that "[t]he inquiry into a plan fiduciary's decision-making process is necessarily 'context specific,' and 'requires assessing the allegations of the complaint as a whole' to determine whether the 'facts alleged are suggestive of, rather than merely consistent with, a finding of misconduct'" (first quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014); and then quoting *PBGC*, 712 F.3d at 719)).

Plaintiff alleges that the Trustees and Meketa breached their fiduciary duty to participants by allocating "over 50% of the Fund's assets to the highest risk asset classes," which "was far beyond what any other Taft-Hartley plan did," hiring Meketa "in a dual conflicted role," relying "on Horizon's assumed 8.5% return after the MPRA Applications" showed that "the ASOP-27 compliant return assumption for the Plan was . . . below 7.5%," and continuing to pursue the "high-risk class allocation" even after learning that "[t]he risky portfolio performed worse than peer plans over both the short- and long-term." (Dkt. No. 140, at 25–29).

The Trustees move to dismiss on the ground that "[t]he Complaint . . . is bereft of any allegations that the Board failed to meet regularly, failed to consider relevant information about investments, failed to obtain expert investment inputs, or failed to follow expert advice—the hallmarks of a flawed process." (Dkt. No. 124-1, at 22). The Trustees argue that "[t]he challenged investment strategy in this case dovetailed" with the Plan's "long-term investment strategy," which was crafted to address the liabilities of Fund and "extend[ed] for decades in the future." (*Id.* at 24). The Trustees assert that the Complaint "makes no effort to examine how [the] challenged investments fit and operated within the broader investment portfolio," and in the

context of the "Fund's challenging circumstances." (*Id.* at 26–27). Finally, the Trustees argue that the Complaint fails to identify "any relevant benchmarks" or "comparator funds" that would show "'that a prudent fiduciary in like circumstances would have acted differently.'" (Dkt. No. 124-1, at 27–30 (quoting *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018)).

The omission of allegations regarding the Trustees' process in deciding to pursue an investment strategy involving the allocation of Plan assets to EME, PE, and "other private market investments" to "chase" an 8.5% investment return, is not necessarily "fatal," when the complaint contains circumstantial factual allegations that allow a plausible inference of procedural imprudence. *PBGC*, 712 F.3d at 719 (explaining that circumstantial factual allegations may be sufficient if, for example, the complaint were to "allege facts sufficient to raise a plausible inference that the investments at issue were so plainly risky at the relevant times that an adequate investigation would have revealed their imprudence"). Thus, when considering claims regarding the risk-profile of a portfolio as a whole, "the prudence of each investment is not assessed in isolation but, rather, as the investment relates to the portfolio as a whole." *Sacerdote II*, 9 F.4th at 109. However, the general "principle that a portfolio should be assessed holistically does not preclude critical assessment of individual funds." *Id.* (citing *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 330 (3d Cir. 2019)).

### i.      8.5% "Actuarial Return Target"

The Complaint alleges that the Plan's 8.5% "actuarial return target" was "unreasonable and grossly excessive." (Dkt. No. 1, ¶ 50). In support of his argument that Defendants' utilization of 8.5% as an investment return target was imprudent, Plaintiff cites Horizon's 2015 survey of investment professionals, which indicated that "the probability of achieving an 8% return over a 10-year period was less than 1/3," (*id.* ¶ 51), and Horizon's capital market surveys during the

class period, which showed "continuing decline in the probability of achieving a 7.50% return

for a benchmark multiemployer plan portfolio from 40.6% in 2014 to 33.6% in 2019," (*id.* ¶

54.a.). But these surveys post-date the class period and thus do not allow a plausible inference

that Defendants' use of an 8.5% return target in, for example, 2014, at the start of the class

period, was imprudent as neither the Trustees nor Meketa would have had access to such

information at the time.[25] *See PBGC*, 712 F.3d at 723 (concluding the complaint failed to "allege

facts plausibly showing that" fiduciary "knew, or should have known, at the relevant times, that

the securities . . . were imprudent investments" even though "the whole world knows (in

hindsight) that many subprime mortgages turned out to be disastrous investments").

## ii.        Allocation Strategy

Plaintiff alleges it was imprudent for the Trustees and Meketa to allocate up to 50% of

Plan assets to "high-risk" investments—such as investments in EME and PE—that pose a risk of

volatility and illiquidity, have higher management fees, and lack transparency. (Dkt. No. 1 ¶¶

56–57). According to the Complaint, in May 2014, Meketa advised that compared to its "U.S.

Peer Group" of "U.S. Taft-Hartley Peers," the Plan had a 16% equity allocation to EME and

15% equity allocation to PE, while its "Peers" had 2% equity allocation to EME and 4% equity

allocation to PE. (*Id.* ¶ 67). Plaintiff argues that an inference of imprudence can be drawn from

these allegations. The Complaint provides no additional facts regarding the Plan's "Peers," such

as the size or financial condition of the other plans, the number of plans represented, or the risks

---

[25] The Complaint also alleges that "Meketa knew as the investment consultant to another Taft-Hartley plan with a similarly high-risk asset allocation significantly overweight in EME and PE (the American Federation of Musicians & Employers Pension Fund ('AFM-EPF'), that the AFM-EPF's actuary, Milliman, refused the trustees' request to increase the 7.5% actuarial return assumption based on the plan's high risk asset allocation." (Dkt. No. 1, ¶ 56). The Complaint contains no allegations regarding when this occurred with respect to the AFM-EPF plan and provides no additional factual details. This allegation, therefore, fails to provide any basis for concluding that Meketa was aware of this information during the relevant time period.

levels of the "peer" plans' other investments. Without more, these facts allow only the inference

of the "mere possibility of misconduct." *PBGC*, 712 F.3d at 718; *see Smith v. CommonSpirit

Health*, 37 F.4th 1160, 1167 (6th Cir. 2022) ("A side-by-side comparison of how two funds

performed in a narrow window of time, with no consideration of their distinct objectives, will not

tell a fiduciary which is the more prudent long-term investment option."); *see also*, *e.g.*,

*Barchock v. CVS Health Corp.*, 886 F.3d 43, 52 (1st Cir. 2018) (finding it was "unreasonable to

infer solely from the complaint's allegation that" because fiduciary "departed radically" from the

"annual arithmetic means of cash-equivalent allocations by like funds" that the fiduciary was a

"'severe outlier' from all other such funds when it came to asset allocation decisions"); *cf.*

*Meiners*, 898 F.3d at 823 ("The fact that one fund with a different investment strategy ultimately

performed better does not establish anything about whether the Wells Fargo TDFs were an

imprudent choice at the outset."); *PBGC*, 712 F.3d at 726 ("The allegation that Morgan Stanley's

investments created risk 'well in excess' of the risk inherent in the benchmark is a conclusory

assertion, unsupported by any factual allegation other than the Amended Complaint's

comparison of mortgage-backed securities in the Portfolio and in the [benchmark]."). [26]

The Complaint alleges that in February 2016, Meketa advised the AFM-EPF plan that the

"discretionary portfolios" it managed for "other clients were completely out of [EME] due to

global uncertainty and China conditions unless constrained to make such an allocation" and

recommended that the "AFM-EPF substantially to de-risk from EME and recue its EME

allocation by 40%." (Dkt. No. 1, ¶ 75). Again, the Complaint contains no factual allegations

concerning the comparability of the AFM-EPF plan and the Plan at issue, or the EME funds in

---

[26] The Complaint also contains a table with "data from the Wilshire Trust Universe Comparison Service for other Taft-Hartley plans," which, Plaintiff contends, "reflects that the Plan's aggressive asset allocation is an extreme outlier." (Dkt. No. 1, ¶ 62). The Complaint does not explain what the "Wilshire Trust Universe Companion Service" offers, what "other Taft-Hartley plans" are included, or what the numbers within the table represent.

which AFM-EPF had invested. The Complaint alleges that both plans invested in EMEs, but provides no facts regarding the individual funds that made up AFM-EPF's EME investment or showing what percentage of plan assets AFM-EPF allocated to EME funds. Thus, the Complaint fails to allow a plausible inference that Meketa or the Trustees were imprudent in continuing its 16% "equity allocation" to EME. Moreover, without facts concerning the percentage of "equity allocation" the AFM-EPF plan made to EME investments, the Court has no means of determining what impact of the "recu[ing]" an "EME allocation by 40%" would have on the overall allocation. Thus, this allegation fails to allow an inference of procedural imprudence by Meketa or the Trustees.

### iii.        Risk, Volatility, and Illiquidity

Plaintiff argues that the high risk of EME and PE investments were well known to the Trustees and Meketa. According to the Complaint, Meketa advised the Trustees that EME investments had "risks of high volatility, [s]ignificant short-term relative performance risk," "high cost, [m]ore expensive higher management fees, trading cost, custody costs, etc." (Dkt. No. 1, ¶ 57). Meketa advised that PE investments carried "the risks of '[i]lliquidity,' as well as '[h]igher management fees" and "[l]ack of transparency." (*Id.* ¶ 58). The Complaint does not allege when Meketa provided this advice.

In 2014, "Meketa advised: Relative to the peer universe the fund is significantly underweight domestic and international developed market equities, and is significantly overweight to emerging markets and private equity." (*Id.* ¶ 59). Meketa's 2014 reports advised "emerging market economic growth has been slower than expected and more varied," outlined the factors that that would "likely" negatively impact EME, including disappointing growth in China, increase in interest rates, and reduction in liquidity. (*Id.* ¶ 65). Meketa further advised that

"[u]ncertainties around global demand (Particularly from emerging markets), stimulative monetary policy, and geopolitical tensions will likely cause heightened volatility." (*Id.*). Meketa advised that "Pension Funds that performed strongly in 2013 had large allocations to domestic and developed international equities" and smaller allocations to EME. (*Id.* ¶ 66). Meketa advised that the Plan "returned 9.6%, gross of fees" exceeding "the 8.5% return expectation" and that although "[c]ompared to peers . . . this return ranked below the median return," "[t]his was not surprising given the Fund's relatively large allocation to [EME] and debt compared to peers." (*Id.* ¶ 67). In 2015, Meketa advised that the "strong US dollar has hurt emerging market returns," and that as EME is a "high risk asset class," "drawdowns can be severe," that emerging markets have experienced "significant volatility," and that EME have "[l]ess diversification benefit versus 15–20 years ago. Event and political risk." (*Id.* ¶ 71). In 2016, Meketa advised that EME had "recently experienced lower investment returns, due in part to slowing growth in China, declining commodity process, and a stronger U.S. dollar" and that "[g]rowth in emerging markets economies could be uneven going forward, with commodity export-dependent economies particularly hurt by a sustained slowdown in global growth and prices." (*Id.* ¶ 72).

As an initial matter, the Court notes that there are no factual allegations regarding when the Trustees or Meketa began implementing the investment strategy at issue in this case. As the Complaint cites reports from March 2014 referring to the Plan's "significantly overweight" with respect to EME and PE, it is reasonable to conclude that the strategy began prior to March 2014. (*See*, *e.g.*, *id.* ¶ 66 (Meketa March 2014 report referring to the Plan as "significantly overweight" as to EME and PE)). Further, there are no factual allegations in the Complaint regarding the Trustees or Meketa's knowledge, the methods they employed, or investigations they conducted when they began implementing the allocation strategy at issue. However, a "claim for breach of

fiduciary duty under ERISA may survive a motion to dismiss—even absent any well-pleaded factual allegations relating directly to the methods employed by the ERISA fiduciary—if the complaint 'allege[s] facts that, if provide, would show that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *PBGC*, 712 F.3d at 718 (quoting *In re Citigroup*, 662 F.3d at 141). Thus, the Court considers whether, as Plaintiff argues, the Complaint adequately alleges that a prudent fiduciary in 2014 would have known that allocating 30% to 50% of a Plan's assets to EME and PE investments was improvident due to their risky nature and volatility.

The Complaint alleges that the reports by Meketa in 2014 through 2016 warned of EME volatility, slower growth than expected, that growth in emerging market economies may be uneven in the future, and that there was less diversification benefit, reported lower investment returns, and acknowledged that pension funds with "large allocations to domestic and developed international equities" "performed strongly in 2013." However, none of these generalized allegations regarding EME risk factors allow a plausible inference that the specific EME funds in which the Plan invested, Aberdeen, Dimensional, Vontobel, SSgA, or GQG,[27] were imprudent. *See PBGC*, 712 F.3d at 721–22 ("The most glaring problem with St. Vincent's allegations, however, is that the Amended Complaint does not allege any such surrounding circumstances that might make this inference plausible, and fails to connect the alleged 'warning signs' [regarding high-risk mortgage securities] to any specific characteristics of the securities in the Portfolio."); *see also Anderson v. Intel Corp.*, No. 19-cv-04618, 2021 WL 229235, at *11, 2021 U.S. Dist. LEXIS 12496, at *40 (N.D. Cal. Jan. 21, 2021) ("The Court therefore finds that

---

[27] Nor are there any facts alleged that would allow an inference that when Vontobel was removed from the Plan in 2016, it was imprudent for the Trustees to add another EME fund, SSgA, investing $35 million, or imprudent to invest $64 million to GQG Partners in 2017 and 2018. (Dkt. No. 1, ¶¶ 76–77).

although Plaintiffs have plausibly alleged that there was some evidence available in 2011 that hedge funds and private equity funds carried risks and that a prudent fiduciary could have found that evidence, that small body of evidence is insufficient on its own to support a claim for breach of the duty of prudence by the Investment Committee."). Further, none of Meketa's reports contained any warnings about investments in PE, natural resources, or infrastructure. Thus, the Complaint fails to allege facts that would allow a plausible inference that the Trustee's or Meketa's decision to invest approximately 30% of Plan assets in EME and PE was imprudent in 2014 or beyond. *See PBGC*, 712 F.3d at 722 & n.20 (finding the complaint failed to allege facts showing "how risky those unspecified [sub-prime mortgage backed] investments became relative to their price, nor does it allege any facts suggesting that a prudent investor at the time would have viewed this unspecified risk as high enough to render the investments imprudent," noting "[f]or instance, the Amended Complaint does not allege that the ratings of the relevant securities fell below the ratings-agency benchmarks established by plan documents . . . nor does it allege facts plausibly showing that the securities were improvidently risky according to some other metric or method used by prudent investors at the time").

### iv.     Relative Performance

"In some cases, it would be reasonable to infer from a decline in the price of a security, combined with other alleged facts, that the security no longer was a sound investment." *PBGC*, 712 F.3d at 721. As to performance, Plaintiff alleges that from 2014 to 2020, the Plan's EME investments "generally substantially lagged the S&P 500, the Dow Jones Industrial Average ("DJIA"), and the Vanguard Balanced Index Fund." (Dkt. No. 1, ¶ 81). The "investment performance" percentages in the table on which Plaintiff relies, *see supra* Figure 2, indicate that the "Plan's EME investments" performed worse than these three funds in 2014, 2015, 2018, and

2019, performed within the same range in 2016, and performed better in 2017.[28] (Dkt. No. 1, ¶ 81). However, the Complaint fails to allege any facts that would allow a plausible inference that the S&P 500, the DJIA, or the Vanguard funds are appropriate benchmarks or comparators against which to measure the performance of Plan's EME investments. *Patterson*, 2019 WL 4934834, at \*11, 2019 U.S. Dist. LEXIS 174832, at \*36 (rejecting at pleading stage, the plaintiffs' "conclusory assertion that the Global Real Estate Fund did not perform as well as a supposedly comparable investment opportunity" observing that the complaint "lacks any detail as to the extent of the investment's shortcomings or why the Global Real Estate Fund is a comparable investment"); *Anderson*, 2021 WL 229235, at \*8, 2021 U.S. Dist. LEXIS 12496, at \*30 (finding the plaintiffs' allegations that the funds at issue "'underperformed peer balanced funds,' such as the Vanguard Balanced Fund and the LifeStrategy Moderate Growth Fund," deficient, explaining that "simply labeling funds as 'comparable' or 'a peer' is insufficient to establish that those funds are meaningful benchmarks against which to compare the performance of the Intel Funds" and that a because the complaint "failed to provide sufficient allegations to support their claim that these other funds are adequate benchmarks against which to compare the" funds at issue).

Further, even assuming the S&P 500, the DJIA, or the Vanguard funds are appropriate benchmarks or comparators, because the allegations regarding Plan's EME investments show underperformance during a relatively short time period, (Dkt. No. 1, ¶ 81), they are insufficient to allow an inference of an imprudent investment strategy. *See Patterson*, 2019 WL 4934834, at \*10, 2019 U.S. Dist. LEXIS 174832, at \*31–32 (observing that district courts in the Second

---

[28] The table showing these return percentages also shows 2020 "as of end of Q2" and indicates that the Plan EME investments returns fell within the range of Plaintiff's proffered alternative investments. (Dkt. No. 1, ¶ 81 (Plan ( -7.6%); the S&P 500 (-4.4%), the DJIA (-9.9%), and the VBIAX (-0.8%)).

Circuit "have recognized that allegations of consistent, ten-year underperformance may support a duty of prudence claim" (citing *Sacerdote I*, 2017 WL 3701482, at *10, 2017 U.S. Dist. LEXIS 137115, at *30)). Plaintiff's allegations are limited to a six-to-seven-year time period, and show only four years of underperformance, (Dkt. No. 1, ¶ 81), which is insufficient to allow a plausible inference that Defendants' allocation strategy was imprudent, *see Patterson*, 2019 WL 4934834, at *11, 2019 U.S. Dist. LEXIS 174832, at *32–33 (finding the plaintiffs' allegation that the "Mid Cap Fund lagged behind its alleged comparators in 2011, 2012, and 2014, it outperformed all of Plaintiffs' suggested alternative investments in 2013" did "not give rise to the inference that Defendants' decision to retain that investment offering was imprudent").

The Complaint alleges that from 2014 to 2019, the Plan's gross return on investment for its "Aggregate Private Equity Program" met or exceeded Meketa's annual "capital markets assumptions" for PE, but that the gross return on investment failed to meet Meketa's annual "capital markets assumptions" for its "Aggregate" Natural Resources and Infrastructure Programs during these years. (Dkt. No. 1, ¶¶ 88–93). The Complaint does not identify any benchmark or comparator funds or investments. Thus, the Court has no way of evaluating the performance of the Plan's PE, natural resources, or infrastructure investments.

### v.    Excessive Fees

Meketa argues that to the extent the Complaint alleges that the costs or fees of EME and PE investments are too high, it "fails to identify a meaningful benchmark for evaluating the costs of the Fund's emerging and private-market investments. (Dkt. No. 125-1, at 22). The Court agrees. As to fees, the Complaint alleges "the high risk of private markets investments demands a premium, such as a 3% premium above the S&P 500 or a 4% premium above the Russell 3000." (Dkt. No. 1, ¶ 96). However, as the Complaint does not enumerate the "premiums" for

any private markets investment, there is no way to calculate how much a 3% or 4% increase would represent. The Complaint alleges that the combined EME fees for 2014 to 2020 ranged between $993,400 to $2.137 million, but provides no allegations regarding the fees associated with the Plan's PE, Natural Resources, or Infrastructure investments. (*Id.* ¶ 80); *see Bekker*, 2018 WL 4636841, at *7, 2018 U.S. Dist. LEXIS 166690, at *17 ("Plaintiff compares the VEF's fees unfavorably to those charged by the VIIIX, but does not allege that the two funds employed similar operations or investment strategies, nor does Plaintiff proffer any other facts to make the comparison of the funds' fees meaningful and plausibly suggestive of a fiduciary breach."); *Anderson*, 2021 WL 229235, at *9, 2021 U.S. Dist. LEXIS 12496, at *34 ("Without factual allegations to support Plaintiffs' claim that the complaint compares fees incurred by the Intel Funds with a meaningful benchmark, the Court cannot discern whether Plaintiffs are comparing funds that have different 'aims, different risks, and different potential rewards that cater to different investors.'" (quoting *Davis v. Wash. Univ.*, 960 F.3d 478, 485 (8th Cir. 2020)). Thus, the Complaint's allegations regarding the high costs of EME and private-market investments are conclusory and fail to raise a plausible inference of imprudence.

### vi.    Conflicted Role

Plaintiff argues that the allegations regarding Meketa's role as investment consultant and private markets manager and its "potentially conflicting interest" in "advising the Plan on asset allocations" and recommending a "bet-the-house allocation strategy" involving "an outsized private markets investment allocation"—are sufficient to allege breach of fiduciary duty. (Dkt. No. 141, at 17). The Court notes that although "the duties of prudence and loyalty are 'conceptually distinct from one another,' the 'analysis of the duty of loyalty may inform the analysis of the duty of prudence and vice versa.'" *Kohari*, 2022 WL 3029328, at * 9, 2022 U.S.

Dist. LEXIS 136505, at *28 (quoting *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 688 (D. Conn. 2018)). As this argument re-hashes the above arguments, all of which the Court have found fail to allow a plausible inference of imprudence or disloyalty the Court concludes that Plaintiff's duty of prudence claim is duplicative of his duty of loyalty claim. Plaintiff fails to allege a non-duplicative duty of prudence claim. *Cf. Cunningham v. USI Ins. Servs., LLC*, No. 21-cv-1819, 2022 WL 889164, at *6, 2022 U.S. Dist. LEXIS 54392, at *17 (S.D.N.Y. Mar. 25, 2022) (concluding that "because Plaintiff essentially 'recast[s] purported breaches of the duty of prudence as disloyal acts,'" she fails to sufficiently state a claim for breach of the duty of loyalty" (quoting *Rosen v. Prudential Ret. Ins. & Annuity Co.*, 718 F. App'x 3, 7 (2d Cir. 2017)).

### vii.    Collective Allegations

Finally, the Court considers the Complaint as a whole in evaluating whether the allegations are sufficient to sustain a breach of duty of prudence claim. Plaintiff fails to show any allegation alone or in combination is sufficient to state a duty of prudence claim. Plaintiff alleges that: (1) that the 8.5% target asset allocation is excessively high; (2) that Defendants' attempted to "chase" an 8.5% return target by allocating 30–50% of Plan funds to high-risk, high-cost EME and PE investments that underperformed peer funds during the class period; and (3) Meketa operated in a conflicted role. As explained above, the Complaint lacked factual allegations that would allow a "plausible inference that that the investments at issue were so plainly risky at the relevant times that an adequate investigation would have revealed their imprudence, or that a superior alternative investment was readily apparent such that an adequate investigation would have uncovered that alternative." *PBGC*, 712 F.3d at 719.[29] Accordingly, Defendants' motion to dismiss the duty of prudence claim is granted.

---

[29] There is no suggestion that Plaintiff lacked access to Plan documents or reports providing information from which "to fashion a suitable complaint." *PBGC*, 712 F.3d at 723. The Complaint routinely cites "internal Plan documents"

6.    **The Complaint Fails to Plausibly Allege A Lack of Diversification Claim**

Defendants move to dismiss Plaintiff's claim of lack of diversification on the ground that "the Complaint makes no effort to examine how th[e] challenged investments fit and operated within the broader investment portfolio." (Dkt. No. 124-1, at 26–27; Dkt. No. 125-1, at 30–31). Plaintiff opposes dismissal of his diversification claim (Dkt. No. 141, at 29).

ERISA requires a plan fiduciary to "diversify[ ] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." *PBGC*, 712 F.3d at 724 (quoting 29 U.S.C. § 1104(a)(1)(C)). "The 'duty to diversify is not measured by hard and fast rules or formulas.'" *Id.* at 717 (quoting *In re Unisys Sav. Plan Litigation*, 74 F.3d 420, 438 (3d Cir. 1996)). "Instead, 'a prudent fiduciary must consider the facts and circumstances of each case.'" *Id.* (quoting *In re Unisys*, 74 F.3d at 438). The Second Circuit has instructed that the factors to be considered "[i]n deciding whether the diversification requirement was breached" "include (1) the purposes of the plan; (2) the amount of plan assets; (3) financial and industrial conditions; (4) the type of investment . . . ; (5) distribution as to geographic[al] location; (6) distribution as to industries; [and] (7) the dates of maturity." *Id.* (quoting *In re Unisys*, 74 F.3d at 438).

Plaintiff asserts that "[p]rudent diversification means having reasonable allocations to the right asset categories and having diverse holdings within those categories" and that "[w]hat Meketa and the . . . Trustees did is exactly the opposite." (Dkt. No. 141, at 29). The Complaint lacks allegations regarding the amount of plan assets during the relevant time period, the types of

---

and forms, and provides detailed allegations regarding the Plan's investment allocations to "EMEs, PE and other alternatives during the stated years," but almost no information regarding the Plan's investment allocations to other asset classes or investment options. *See id.* (observing that the plaintiff had "access, without discovery to plan documents and reports" but failed to allege "any factual matter about how a prudent investor would have viewed the Portfolio's securities at the relevant times, and in the relevant circumstances").

investments Defendants made, distribution as to geographical locations or industries, dates of maturity, and contains no facts concerning the investment of the remaining 50% to 70% of Plan assets. Thus, even assuming an ERISA plaintiff need not allege each of the above factors, the paucity of factual allegations regarding the Plan's non-EME and PE investments prohibit a plausible inference of lack of diversification. Accordingly, Plaintiff's lack of diversification claim is dismissed.

### 7. The Complaint Fails to Plausibly Allege a Violation of Plan Documents

Plaintiff alleges that Defendants violated ERISA § 1104(a)(1)(D), which requires fiduciaries to act in accordance with plan documents, by failing to "avoid dangerous volatility risk." (Dkt. No. 141, at 28 (citing Dkt. No. 1, ¶ 48)). "The plain meaning of this provision is that if the terms of the plan documents and instruments are consistent with ERISA, a plan trustee has a fiduciary duty to adhere to those terms." *Cement & Concrete Workers Dist. Council Pension Fund v. Ulico Cas. Co.*, 387 F. Supp. 2d 175, 185 (E.D.N.Y. 2005). As the Complaint fails to identify any provision of a Plan document that Defendants have violated, but instead generally cites the statutory provision, the Court finds Plaintiff has failed to state a plausible claim for relief. Indeed, even with respect to volatility, the Plan's Investment Policy Statement instructs that investments should "avoid extreme levels of volatility that could adversely affect the Plan's participants." (Dkt. No. 1, ¶ 48). As discussed, the Complaint does not adequately allege facts regarding volatility, much less allowing an inference that the asset allocations at issue exposed the Plan to "extreme levels of volatility." Accordingly, Plaintiff's claim based on violation of Plan documents is dismissed.

### 8.    There is No Basis for Co-Fiduciary Liability

"ERISA . . . renders a fiduciary liable for the breach of another fiduciary if he or she (1) participates knowingly in, or knowingly undertakes to conceal, and act or omission of such other fiduciary, knowing such act or omission is a breach; or (2) enables another fiduciary to commit a breach; or (3) has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts to remedy the breach." *In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d 345, 367 (S.D.N.Y. 2009) (citing 29 U.S.C. § 1105(a)). However, "[c]laims for breach of the duty to monitor and for co-fiduciary liability require antecedent breaches in order to be viable." *In re Citigroup Erisa Litig.*, 104 F. Supp. 3d 599, 617 (S.D.N.Y. 2015) (citing *In re Nokia ERISA Litig.*, No. 10-cv-3306, 2011 WL 7310321, at *5–6, 2011 U.S. Dist. LEXIS 101265, at *23–24 (S.D.N.Y. Sept. 6, 2011)), *aff'd sub nom. Muehlgay v. Citigroup Inc.*, 649 F. App'x 110 (2d Cir. 2016). The Complaint fails to allege a breach of fiduciary duty, the co-fiduciary duty claims are therefore dismissed.

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Horizon's letter motions (Dkt. Nos. 146, 147) are granted in part and denied in part; and it is further

**ORDERED** that Defendants' motions to dismiss (Dkt. Nos. 102, 124, 125, 179) under Rule 12(b)(1) are **DENIED**; and it is further

**ORDERED** that Defendants' motions to dismiss (Dkt. Nos. 102, 124, 125) under Rule 12(b)(6) are **GRANTED**; and it is further

**ORDERED** that the Complaint **is DISMISSED** and the Clerk is directed to close this case.

**IT IS SO ORDERED.**

Dated: <u>February 7, 2025</u>
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge